**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- x

In re:                                                    Chapter 11

WANSDOWN PROPERTIES CORPORATION N.V.,          Case No.:  19-13223 (SMB)

                Debtor.

-------------------------------------------------------------------- x

WANSDOWN PROPERTIES CORPORATION N.V.,

      Plaintiff
                                                          Adv. Pro. No. 20-01056
        v.
29 BEEKMAN CORP.,

      Defendant.

-------------------------------------------------------------------- x
29 BEEKMAN CORP.,

      Plaintiff

        v.                                      Adv. Pro. No. 20-01063

WANSDOWN PROPERTIES CORPORATION N.V.,
*et al.*,

      Defendants.
                                          x
--------------------------------------------------------------------

**29 BEEKMAN'S MEMORANDUM OF LAW IN OPPOSITION TO DEBTOR'S**
**MOTION FOR SUMMARY JUDMENT AND IN SUPPORT OF 29 BEEKMAN'S**
**<u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT …………………..……………………………………... 1

ARGUMENT ……………………………………………………………………………… 2

I.    Debtor's President and Managing Director Testified that the Parties had Forty-Five Days After the Confirmation Order to Close (March 1, 2020) Before they Would be in Breach – Debtor Abandoned the Deal in Search of More Money for the Property Long Before Then …………….…..……………………………………………..… 2

        A.   Debtor Already Admitted in a Sworn Pleading Before this Court That the Parties Were Not Obligated to Close Until Forty-Five Days After the Entry of the Confirmation Order ……………………………………………….………..…. 3

        B.   Mr. Golsorkhi's Reading of the Contract, as the President and Managing Director of Debtor, is consistent with 29 Beekman's Reading, the Intent of the Parties, and Common Sense ……………………………………………………………......7

        C.   Debtor's Current and Litigation-Driven Reading of the Contract is Commercially Unreasonable Because it Could Put 29 Beekman in Default Before the Court Even Approved the Contract for Sale …………………………………………….… 8

        D.   The Intent of The Parties to Include the 45 Days After the Confirmation Order Language Was to Make Sure 29 Beekman Had Time to Obtain Almost Ten Million Dollars Liquid …………………………………………………………... 9

        E.   Debtor's Implausible and Commercially Unreasonable Reading of the Contract Closing Language Means it Could Wait Until the Very Last Minute to Submit a plan for Approval and Leave 29 Beekman No Time to Prepare to Close ……... 10

        F.   If Any Ambiguity is Found in the Closing Language, then it Should Be Read Against Debtor, Who Drafted the Closing Language and the Court Can also Accept Extrinsic Evidence to Ascertain the Intent of the Parties During Contract Formation ………………………………………………………………………..10

        G.   In Fact, the Closing Language in the Contract Should be Understood in Accordance with its Plain Meaning and without, as Debtor Would Like, Adding Any Words to it …………………………………………………………………11

II.    Debtors Attorney's Actions in Trying to Insert a Time is of Essence Provision in the Sale Order is Strong Evidence that they knew 29 Beekman had until 45 days after the Confirmation Order to Close ……………………………………………..……. 11

III.   Even under Debtor's implausible reading of the Agreement 29 Beekman did not default because the Agreement has no time is of the essence Provision and Debtor did not send a Time is of the Essence Letter after February 10, 2020, it just repudiated..13

IV.   29 Beekman did not have to close at any time because Debtor did not meet critical conditions to closing prior to Debtor's February 28, 2020 repudiation letter .........14

A.   29 Beekman Did Not Have to Close Because Debtor Did Not Meet The Conditions to Closing Section of the Contract, Which Provides that Debtor's Representations As to "All Claims" Be True at the Date of Closing...............14

(i)   Instead of Trying to Work With 29 Beekman in Good Faith to Fix its Failure to Be Able to Satisfy "All Claims" at Closing, Debtor Ran to Court to Rush Through a 363 Sale While Ignoring the Pelmadulla Claim ....................................................................17

V.   Debtor's Argument that 29 Beekman Anticipatorily Breach the Contract is Frivolous because the Law does not Support the Claim and Debtor did not Treat 29 Beekman's Statement as a Breach ..........................................................................19

A.   Debtor Makes a Material Misrepresentation When it States that 29 Beekman "would not close on the sale of the Townhouse." ...................................22

B.   Debtor's Anticipatory Breach Argument is Frivolous Because the Day After 29 Beekman's Letter, Debtor Treated the Contract as Valid and Unassailable and Asked the Court to Approve Assumption of it, Which it Did ......................22

(i)   Immediately After 29 Beekman's Letter, Debtor Asked the Court to Hold Valid and Approve Debtor's Assumption of the Contract, Behavior Directly Inconsistent with Claiming Anticipatory Breach.............................................................................23

(ii)   Debtor's Time is of the Essence Letters, Albeit Invalid, Were Also Inconsistent with its New Claim of Anticipatory Repudiation ...24

C.   29 Beekman Expressly Stated that it Would Perform Under the Contract as Long as Debtor Did Not Treat 29 Beekman's January 15 letter as a repudiation .......25

D.   Even the Meaning of the Statement Single Quotation Debtor Provided Just Meant that Buyer Would Not "Voluntarily" Help Debtor Obtain a 363 Ruling that Would Cost 29 Beekman an Extra $334,750 ...................................................25

VI.   29 Beekman Acted in Good Faith to Make the Deal Work, it Extended the Final Date and Tried to Reach Compromise with Debtor on Multiple Fronts, All the While Expressly Reserving its Right to Argue that Debtor Failed to Meet the Conditions of Closing .....................................................................................................26

VII.     Debtor Continually Acted in Bad Faith and with a Single Minded and Over-zealous Purpose of Obtaining 29 Beekman's Down Payment and Counting on the Bankruptcy Court to Rule in its Favor, as Debtor …………………………………………………27

VIII.    It was Debtor that Walked Away From the Deal to Try and Get a Better Offer and Hold 29 Beekman in Breach …………………………………………………………...28

IX.      29 Beekman did not Object to the Sale Order Because it Accepts and Embraces the Sale Order, Which Sale Order Expressly Required that Debtor Meet the Conditions of the Contract, which Debtor Failed to do……………………………………………..28

         A. The Sale Order Expressly Required That Debtor Meet The Conditions Of The Contract……………………………………………………………………………..28

         B. 29 Beekman Put Debtor on Notice of its Various Breaches……………………..30

X.       Debtor's Failure to Disclose the Pelmadulla Claim Constituted Breach and Fraud in the Inducement……………………………………………………………………………31

         1. The Law Imputes Pelmadulla's Knowledge to the Debtor……………………… 33

         2. The Facts and Pure Principle of Agency Show that Debtor is Acting for Pelmadulla…………………………………………………………………………….. 35

XI.      The Court Should Grant 29 Beekman's Cross-Motion for Summary Judgment…....37

         A. The Court Should Grant 29 Beekman's Cross-Motion for Summary Judgment for all the  Reasons Set forth herein …………………………………………………...37

         B. The Court Should Grant 29 Beekman's Cross-Motion for Summary Judgment Because Debtor Was in Breach of Material Representations in the Contract ……………………………………………………………………....39

CONCLUSION…………………………………………………………………………39

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,
    757 F.2d 523, 528 (2d Cir. 1985)…………………………………………………….…… 3

PPX Enters. v. Audiofidelity, Inc.,
    746 F.2d 120, 123 …………………………..………………………..……………………… 4

McCord v. Jaspan Schlesinger Hoffman, LLP (In re Monahan Ford Corp.),
    390 B.R. 493, 502 (E.D.N.Y 2008) …………………..………………………….…..…… 4

In re Jorczak,
    314 B.R. 474, 483 (D. Conn) …………………………………......…..……………….. 4

*In re Bohrer,*
    266 B.R. 200, 201 (Bankr. N.D. Cal. 2001) …………………….……………………… 4

Butler Wooten & Peak LLP v. GM LLC (In re Motors Liquidation Co.),
    943 F.3d 125, 131 (2d Cir. 2019) …………………………………………….…………… 7

Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.,
    773 F.3d 110, 113-14 (2d Cir. 2014) ……………………………………..…………… 7

Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner &
    Smith, Inc., 232 F.3d 153, 157 (2d Cir. 2000)…….…………………………………… 7

Olin Corp. v. Am. Home Assur. Co.,
    704 F.3d 89, 99 (2d Cir. 2012) ………..……………………………...…………… 7

Everlast World's Boxing Headquarters Corp. v. Trident Brands Inc.,
    2020 U.S. Dist. LEXIS 33266, *25 (S.D.N.Y. 2020) ………………………………… 8

Greenwich Capital Fin. Prods., Inc. v Negrin,
    74 A.D.3d 413, 415 (1st Dep't 2010)…………………..…………..………………… 8

Lipper Holdings, LLC v. Trident Holdings, LLC,
    1 A.D.3d 170, 171 (1st Dep't 2003)…………….………….……………………… 8

Tougher Heating & Plumbing Co. v State of New York,
    73 A.D.2d 732, 423 N.Y.S.2d 289 [1979]…..……………………………….…… 8

Elsky v Hearst Corp.,
    232 A.D.2d 310, 311, 648 N.Y.S.2d 592 [1996] ………………………......…..……….. 8

Madison Murray Assoc. v Perlbinder,
215 A.D.2d 204, 626 N.Y.S.2d 180 [1995].………..………….…..………………….. 8

833 Northern Corp. v Tashlik & Assoc., P.C.,
256 A.D.2d 535, 537, 683 N.Y.S.2d 111 [1998]…………………...……………… 8

Sasson v. Mann,
No. 15-CV-6601 (CS), 2019 U.S. Dist. LEXIS 129464, at *15-16
(S.D.N.Y. Aug. 2, 2019)…………………………………………………………………10

Int'l Multifoods Corp. v. Commercial Union Ins. Co.,
309 F.3d 76, 83 (2d Cir. 2002) ……………….....…………………………………… 11

Morgan Stanley Group Inc. v. New Eng. Ins. Co.,
225 F.3d 270, 275-76 (2d Cir. 2000) …………………...……………………………… 11

Tarlo v. Robinson,
118 A.D.2d 561, 565-566 (2nd Dep't 1986) …………………………………………… 13

76 North Associates v. Theil Management Corp.,
114 A.D.2d 948, 949 (2d Dep't 1985) ……………….…………………………………… 13

Taylor v Goelet,
208 NY 253 ……………………………………………………………………………….. 13

Garry v Edmann Homes,
12 Misc 2d 1032 …………………….…...…………………………………………….… 13

1A [Part 2] Warren's Weed, New York Real Property, Closing of Title,
§ 404 [2] [4th ed] …………………………………………………………………… 13

Ballen v Potter,
251 NY 224 …………………………………………………………………………….. 13

Mader v Mader,
101 AD2d 881 ……………………………………………………………………………… 13

Ring 57 Corp. v Litt,
28 AD2d 548 ……………………………………………………………………………… 13

M. Carl Levine, Morgulas & Foreman v. Canpro Invest., Ltd.,
1990 U.S. Dist. LEXIS 5890, *10-*11 (S.D.N.Y. 1990) ………………………………… 13

Tarlo v. Robinson,
118 A.D.2d 561, 565-566 …………………….…...…………………………………… 14

North Triphammer Dev. Corp. v. Ithaca Associates,
704 F. Supp. 422, 430 (S.D.N.Y. 1989) …………..……………….…..……………… 14


Zev v. Merman,
134 A.D.2d 555, 521 N.Y.S.2d 455 (2d Dep't 1987) …………….…..…………….. 14

72 N.Y.2d 802, 530 N.Y.S.2d 554, 526 N.E.2d 45 (1988) …………………….………. 14

Mazzaferro v. Kings Park Butcher Shop,
121 A.D.2d 434, 503 N.Y.S.2d 134 (2d Dep't 1986) …………………….…..……… 14

Serdarevic v. Centex Homes, LLC,
2012 U.S. Dist. LEXIS 179576, *6 (S.D.N.Y Nov. 7, 2012) ………………………….. 15

Esquire Trade & Fin., Inc. v. CBQ, Inc.,
2009 U.S. Dist. LEXIS 105417, *5-6 (S.D.N.Y Nov. 5, 2009) …………….…….… 15

Briarwood Farms, Inc. v. Toll Bros., Inc.,
2011 U.S. App. LEXIS 25595, *4 (2d Cir. Dec. 22., 2011) ………………..………… 19


DiFolco v. MSNBC Cable L.L.C.,
622 F.3d at 112 ………………………………………………………………...…. 19

Tenavision, Inc. v. Neuman,
45 N.Y.2d 145, 150, 379 N.E.2d 1166, 408 N.Y.S.2d 36, 38 (1978) ………………….. 19

Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.,
92 N.Y.2d at 463, 682 N.Y.S.2d at 667 …………….……………………………….. 19

Hartford Accident & Indem. Co. v. Wesolowski,
33 N.Y.2d 169, 172, 305 N.E.2d 907, 350 N.Y.S.2d 895, 898 (1973) ………..……….. 19

Consist Software Solutions, Inc. v. Software AG, Inc.,
2009 U.S. App. LEXIS 6549 (2d Cir. 2009) ………..…………………………………. 19

N.Y., Inc. v. Niagara Mohawk Power Corp.,
259 A.D.2d 932, 934, 686 N.Y.S. 2d 911 (3d Dep't 1999) ………………………….. 20

Emigrant Indus. Savings Bank v. Willow Builders, Inc.,
290 N.Y. 133, 144, 48 N.E.2d 293 (1943) ……………………...…………………… 20

Lucente v. IBM,
310 F.3d 243, 259 (2d Cir. 2002) ……………………………………………………. 20

Consist Software Solutions, Inc. v. Software AG, Inc.,
    2009 U.S. App. LEXIS 6549, *3 (2d Cir. 2009) …………………………………… 22

Empire State Bldg. Co., L.L.C. v. New York Skyline, Inc.
    (In re New York Skyline, Inc., 432 B.R. 66, 82 (Bankr. S.D.N.Y 2010)……………… 22

Consist Software Solutions, Inc. v. Software AG, Inc.,
    2009 U.S. App. LEXIS 6549, *3 (2d Cir. 2009) …………………………………… 24

Tarlo v. Robinson,
    118 A.D.2d 561, 566 (2d Dep't 1986) ……………………………………………… 27

Empire State Bldg. Co., L.L.C. v. New York Skyline, Inc. (In re New York Skyline, Inc.)
    432 B.R. 66, 77 (Bankr. S.D.N.Y. 2010……………………………………………30

Brown Media Corp. v. K&L Gates, LLP,
    854 F.3d 150, 163 (2d Cir. 2017) ………………………………………………… 30

DAN B. DOBBS, LAW OF REMEDIES § 4.3(6), at 614 (2d ed. 1993)………………………..31

JOSEPH M. PERILLO, CORBIN ON CONTRACTS ¶ 1.6, at 18 (Rev. ed. 1993)…………….31

Cox v. Stokes,
    156 N.Y. 491, 51 N.E. 316, 320-21 (N.Y. 1898)………………………………….…..31

New Paradigm Software Corp. v. New Era of Networks, Inc.,
    107 F. Supp. 2d 325, 329 (S.D.N.Y. 2000)…………………………………………...32

Empire State Bldg. Co., L.L.C. v. New York Skyline, Inc. (In re New York Skyline, Inc.),
    432 B.R. 66, 75-76……………………………………………………..………………..32

Albany Motor Inn & Restaurant, Inc. v. Watkins,
    85 A.D.2d 797, 798 (3d Dep't 1981)………………………………………………………32

Brodsky v. Nerud,
    68 AD2d 876……………………………………………………………………………..32

Fruchtman v. First Edition Composite Holdings, Inc.,
    1991 U.S. Dist. LEXIS 15949, *12 (S.D.N.Y. 1991) ………………………………….. 32

Albany Motor Inn and Restaurant, Inc. v. Watkins,
    85 A.D.2d 797, 445 N.Y.S.2d 616, 617 (3d Dept. 1981) ……………………………… 32

Seneca Wire & Mfg. Co. v. A.B. Leach & Co.,
    247 N.Y. 1, 159 N.E. 700, 702 (1928) …………………………………………………. 32

Bankruptcy Servs. v. Ernst & Young (In re CBI Holding Co.),
    529 F.3d 432, 453 (2d Cir. 2008)…………………………………………………………..33

Trott v. Platinum Mgmt. (NY) LLC (In re Platinum-Beechwood Litig.), 2019 U.S. Dist. LEXIS
    104562, *62 (S.D.N.Y. 2019)…………………………………………….………………..33

Baker v. Latham Sparrowbush Assocs.,
    72 F.3d 246, 255 (2d Cir. 1995)……………………………………………………………33

Breeden v. Kirkpatrick & Lockhart, LLP,
    268 B.R. 704, 709 (S.D.N.Y. 2001)……………………………………………………..34

In re Bennett Funding Grp., Inc.,
    336 F.3d 94 (2d Cir. 2003)…………………………………………………………………34

**PRELIMINARY STATEMENT**

Debtor's reading of the applicable contract closing language is wrong because it is not only contrary to the standard in the industry, as explained by two well-known and respected real estate experts with combined forty-five years of experience, but also would render the Contract's closing language commercially unreasonable and absurd. Debtor's reading of the Contract language today is also contrary to the reading of the Contract adopted by Debtor's own President and Managing Director, Mr. Gholam Reza Golsorkhi, soon after he executed the Contract. Mr. Golsorkhi testified under oath in an affidavit under Bankruptcy Rule 1007-2 and in support of the bankruptcy filing, sworn to under penalty of perjury, that the closing was scheduled forty-five days after the Confirmation Order, which date occurred long after Debtor repudiated the Contract and elected to abandon the deal.

Mr. Golsorkhi should know about the Contract because he coordinated with Debtor's Sole Shareholder and negotiated the purchase price for the deal as the only employee of Debtor, which is a company organized by the Sole Shareholder to do nothing but manage and maintain the property at issue.  The Court will notice that Mr. Golsorkhi, having taken a position in the past under oath that is directly contrary to Debtor's position now, is noticeably silent and nowhere to be seen or heard from, hiding from the Court's scrutiny after having sworn to a position contrary to the one Debtor maintains now.  As the person who knows best (along with 29 Beekman's officers) when the parties intended to close, Mr. Golsorkhi's absence speaks volumes.  The Court can and should rule for 29 Beekman on summary judgment based on Mr. Golsorkhi's sworn admission alone.

Debtor's argument of anticipatory breach is frivolous because a day after the date that Debtor now claims 29 Beekman anticipatorily breached, Debtor represented to the Court that the

1

Contract was valid and enforceable and should be assumed. Debtor not only adopted the

Contract after the (now) asserted anticipatory breach, but tried to enforce its terms (albeit

wrongly construed) against 29 Beekman, actions that preclude a claim for anticipatory breach as

a matter of very basic contract law.  The argument should not have been propounded.

## ARGUMENT

## I.    DEPTOR'S PRESIDENT AND MANAGING DIRECTOR TESTIFIED THAT THE PARTIES HAD FORTY-FIVE DAYS AFTER THE CONFIRMATION ORDER TO CLOSE (MARCH 1, 2020) BEFORE THEY WOULD BE IN BREACH -- DEBTOR ABANDONED THE DEAL IN SEARCH OF MORE MONEY FOR THE PROPERTY LONG BEFORE THEN

Debtor's case is largely premised on its current position that 29 Beekman breached the

Contract when it failed to close on the "Final Date" listed in the Contract. Pl's Mem., at 6, ¶¶ 18-

19.  However, as described and explained in great detail in the expert report of Stacie

Handwerker, with twenty-seven years experience in negotiating and drafting residential real

estate contracts, the expert report of Alexander Suslensky, with eighteen years experience

negotiating and drafting real estate contracts, the affidavit from 29 Beekman's representative and

the affidavit of Seth Akabas, who negotiated with Debtor's counsel for the specific closing dates

at issue: the Final Date is the date by which the parties would be relieved of their obligation to

close, and is **not** the date by which they would be in breach for failing to close. The date on

which the parties had a contractual obligation to close was 45 days after the entry of the

Confirmation Order (here the Sale Order entered January 16, 2020), namely March 1, 2020.  See

Expert Report of Stacie Handwerker; Expert Report of Alexander Suslensky, Affidavit of

Mwafak Peress; and Declaration of Seth Akabas.

By letter dated February 18, 2020, Debtor claimed that 29 Beekman had breached by

failing to close on February 15, 2020, and Debtor stated that it would walk away from the deal.

Declaration of Christopher Serbagi ("Serbagi Decl."), at Ex. 1.  Because Debtor's letter was two

weeks prior to the March 1, 2020 closing date (namely 45 Days after the Confirmation Order),

29 Beekman could not have breached as a matter of law. Debtor walked away from the deal and

insisted that 29 Beekman had to close when that was not the case. Id. The Applicable closing

language in the Contract states:

> **51. Bankruptcy Matters and Closing.**
>
> (e) The closing of the transactions contemplated herein ("Closing Date") shall take place
> no later than the forty-five (45) days after the Confirmation Order which becomes final
> and non-appealable, at the office of Blank Rome LLP, 1271 Avenue of the Americas,
> New York, NY 10020, provided, however, that in no event shall the Closing take place
> later than January 31, 2020, subject to extension of the Final Date (defined below).

Serbagi Decl., Ex. 2**,** at Sec. 51(e).

> 52. In addition to the **conditions** set forth in Paragraph 13 of this Contract, this
> Contract, Purchaser's obligation to purchase the Premises, and Seller's obligation to
> convey the Premises in accordance with this Contract are also subject to, and conditioned
> upon, the fulfillment of the following conditions precedent: . . .
>
> d. The Closing shall occur within forty-five (45) days after the entry of the Confirmation
> Order but no later than January 31, 2020 (such January 31, 2020 date, as extended
> hereunder, the "Final Date"); provided, however, that Purchaser may extend such Final
> Date, on one or more occasions, until the earlier of 30 days after the entry of the
> Confirmation Order or J anua1y 31, 2021 by notice to Seller prior to the passing of the
> then effective Final Date.

Id., at Sec. 52(d) (emphasis added).

### A.  Debtor Already Admitted in a Sworn Pleading Before this Court That the Parties Were Not Obligated to Close Until Forty-Five Days After the Entry of the Confirmation Order

 A party's assertion of fact in a pleading is a judicial admission by which it normally is

bound throughout the course of the proceeding.  Bellefonte Re Ins. Co. v. Argonaut Ins. Co., 757

F.2d 523, 528 (2d Cir. 1985) (rejecting plaintiff's attempt to avoid summary judgment by relying

on affidavits that contradicted an express allegation in its complaint, because "[a] party's

assertion of fact in a pleading is a judicial admission by which it normally is bound throughout

the course of the proceeding"); PPX Enters. v. Audiofidelity, Inc., 746 F.2d 120, 123 ("Under

federal law, stipulations and admissions in the pleadings are generally binding on the parties and

the Court."). That is no less true in bankruptcy proceedings. A judicial admission is a formal

concession by a party, or its counsel, in a pleading, brief, or stipulation and is binding on the

party and the Court. McCord v. Jaspan Schlesinger Hoffman, LLP (In re Monahan Ford Corp.),

390 B.R. 493, 502 (E.D.N.Y 2008); In re Jorczak, 314 B.R. 474, 483 (D. Conn) ("Statements in

bankruptcy schedules are executed under penalty of perjury and when offered against a debtor

are eligible for treatment as judicial admissions.") (citing In re Bohrer, 266 B.R. 200, 201

(Bankr. N.D. Cal. 2001)).

Debtor itself has stated in a sworn bankruptcy filing before this Court that the parties had

until forty-five days after the Confirmation Order to close. Serbagi Decl., Ex. 3, at ¶20.  In

particular, when Debtor filed for bankruptcy on October 8, 2019, its sole President and

Managing Director, Mr. Gholam Reza Golsorkhi, submitted an affidavit under Bankruptcy Rule

1007-2, sworn to under penalty of perjury. Id. at ¶1. Mr. Golsorkhi testified in detail about the

Debtor's assets and liabilities and financial information (Id. at ¶¶ 5-14, 22-26); he expressed

detailed knowledge about the subject Property ( Id. at ¶¶4-26); he testified in detail about the

listing and marketing of the Property and prior offers (Id. at ¶¶15-21); and he testified about the

particular negotiations that took place with 29 Beekman and called them "arms length." (Id. at

¶18). Moreover, Debtor's attorney stated at the November 14, 2019 hearing that there was really

4

only one person at Debtor, which had to mean Golsorkhi, and another person who did

maintenance work.  Serbagi Decl., Ex. 4, at 4:8-13.

     Given Mr. Golsorkhi's detailed knowledge of the subject Property; Serbagi Decl., Ex. 3,

at ¶¶5-26; the arms-length negotiations he said he took part in, he was in a position to know

about the closing date; Id. at ¶18.  Mr. Golsorkhi also testified on January 16, 2020 that he had

been going to the townhouse every day for the last forty years and he worked at the town house;

Id. at Ex. 5, at 39:15-19;  personally took offers for the property that he directed to Debtor's Sole

Shareholder Pelmadulla for approval (Serbagi Decl., Ex. 5, at 10:24-11:2; 20:24-21:6); and that

Mr. Golsorkhi signed the Contract on behalf of Debtor, Mr. Golsorkhi's representations about

the Property and closing date obligations have special credibility and significance.  In particular,

Mr. Golsorkhi expressly and without reservation stated in a sworn affidavit that the Closing

would take place **no later than forty-five (45) days after the entry of an order confirming a**

**chapter 11 plan.**  Serbagi Decl., Ex. 3, at ¶20.  Golsorkhi stated:

> 20.    Under the RSA, the parties have agreed that the
> consummation of the transactions contemplated in the RSA is
> subject to the Debtor's receipt of requisite authority under the
> Bankruptcy Code pursuant to, among other things, the entry of an
> order confirming a chapter 11 plan, or if not possible, then an order
> approving a sale of the property under section 363 of the
> Bankruptcy Code. **The closing of the transactions contemplated**
> **in RSA are scheduled to take place no later than forty-five (45)**
> **days after the entry of an order confirming a chapter 11 plan.**

Id. (emphasis added).  Bankruptcy Rule 1007-2, under which the Golsorkhi Affidavit was filed,

requires the Debtor to submit an affidavit in support of its initial bankruptcy filing.  Rule 1007-2

lists an extensive list of disclosures the Debtor must provide in support of the petition for

bankruptcy, including information pertaining to property, and assets of the company, etc. Rule

1007-2(a)(18-19).

If Mr. Golsorkhi (Debtor's President and Managing Director) believed that the real deadline for Buyer to close was January 31, 2020, he would have said so when he filed his sworn pleading, attested to under penalty of perjury, and executed by him shortly after he personally executed the Contract.  Serbagi Decl., Ex.3.  He didn't.  Moreover, Mr. Golsorkhi testified under oath that he directly negotiated with the Sole Shareholder (Serbagi Decl., Ex. 5, at 10:24-11:2; 20:24-21:6); and knew the details about the subject Property. Serbagi Decl., Ex. 3. Debtor's attorneys now take a different position from the position their own client has taken under oath.

Given the conflicting positions, Mr. Golsorkhi has been conveniently silent in this briefing.  Not only has he not submitted an affidavit in support of Debtor's motion for summary judgment, as the person most knowledgeable at Debtor, in fact the only person at Debtor. (Serbagi Decl., Ex. 4, at 4:8-13) but he has failed to even try to explain away his prior judicial admission.  The Court should not permit Debtor to take a position directly contrary to its prior judicial admission.

Accordingly, the Court should hold Debtor to its admissions and find that the parties were not obligated to close until forty-five days after the January 16, 2020 Confirmation Order, namely March 1, 2020.  Moreover, because the parties did not include a "time is of the essence" provision in the Contract, 29 Beekman would have had an additional thirty days to close from when the Debtor sent a "time is of the essence letter," (Handwerker Report., at ¶¶12-13 or a reasonable amount of time under the circumstances. Suslensky Report, at ¶10. Thus, according to the law, even if 29 Beekman had failed to close on March 1, 2020, and Debtor served a "time is of the essence letter" on March 2, 2020, 29 Beekman would have had until approximately

April 2 to close. Accordingly, 29 Beekman was not in breach in February when <u>Debtor</u> rejected

29 Beekman's offer to extend the Final Date, and Debtor itself abandoned the Contract.[1]

> **B.   Mr. Golsorkhi's Reading of the Contract, as the President and Managing Director of Debtor, is consistent with 29 Beekman's Reading, the Intent of the Parties, and Common Sense**

It is elemental contract law: "When interpreting a contract under New York law, a court's

"'primary objective is to give effect to the intent of the parties as revealed by the language of

their agreement." <u>Butler Wooten & Peak LLP v. GM LLC</u> (<u>In re Motors Liquidation Co</u>.), 943

F.3d 125, 131 (2d Cir. 2019) (citing <u>Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.</u>,

773 F.3d 110, 113-14 (2d Cir. 2014) (quoting <u>Compagnie Financiere de CIC et de L'Union</u>

<u>Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 232 F.3d 153, 157 (2d Cir. 2000)).

"The words and phrases in a contract should be given their plain meaning, and the contract

should be construed so as to give full meaning and effect **to all of its provisions**." <u>Id.</u> at 114

(internal quotation marks omitted) (quoting <u>Olin Corp. v. Am. Home Assur. Co.</u>, 704 F.3d 89, 99

(2d Cir. 2012)) (emphasis added). The plain words of the Contract establish a date by which the

parties "shall" close (45 days after the Confirmation Order), and a date, i.e., expressly, a

condition precedent, after which the closing could not be required (January 31, 2020, as

extended).

Debtor's current position that 29 Beekman had to close on January 31, 2020 (as extended

to February 10, 2020) is not only inconsistent with the sworn testimony of its own President and

---

[1] Debtor most likely never wanted to close under the Contract – no other logical reason explains why Debtor rejected 29 Beekman's offer to extend the Final Date. Debtor appears to have viewed the Contract as a mere tool necessary for Debtor to create the bankruptcy platform that it could use to (i) cancel the then pending sheriff's sale of the Property, and (ii) challenge the judgment creditor Azari's claim, for which Debtor appears to have thought that the Pelmadulla Claim would be necessary as a triggering unsecured creditor, and Debtor was hence always prepared to sacrifice closing under the Contract in order to accomplish its main goal of upsetting Azari's judgment.

Managing Director (Serbagi Decl., Ex. 3), it is also contrary to common sense and the standard in the industry, as well as the exact words that are actually in the Contract. See generally Handwerker Report; Suslensky Report.  As explained in great detail and clarity by 29 Beekman's experts in real estate contracts transactions and by Seth Akabas, the attorney that participated directly in the negotiations, and by 29 Beekman's representative Mwafak (Mike) Peress, the intent of the parties was to leave forty-five days after the Confirmation Order to close because 29 Beekman could not and would not liquidate assets and commit to buying a $10.3 million property until it knew the Court had approved the sale. Akabas Decl., at ¶¶2, 17, 26, 30, 35; Peress Aff., at 9; Suslensky Report generally; Handwerker Report generally.

> ### C.  Debtor's Current and Litigation-Driven Reading of the Contract is Commercially Unreasonable Because it Could Put 29 Beekman in Default Before the Court Even Approved the Contract for Sale

It is Black letter law: ("[A] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." Everlast World's Boxing Headquarters Corp. v. Trident Brands Inc., 2020 U.S. Dist. LEXIS 33266, *25 (S.D.N.Y. 2020) (quoting Greenwich Capital Fin. Prods., Inc. v Negrin, 74 A.D.3d 413, 415 (1st Dep't 2010)(Construing the Recourse Guarantee to give it a fair and reasonable meaning). The First Department stated in Lipper Holdings, LLC v. Trident Holdings, LLC, 1 A.D.3d 170, 171 (1st Dep't 2003)

> Restricting the exercise of such discretion to the final accounting period, as urged by those limited partners opposing the distribution plan, would bestow a windfall on certain limited partners and unfairly permit the general partner to retain incentive compensation, based entirely on phantom profits. A contract should not be interpreted to produce a result that is absurd (see Tougher Heating & Plumbing Co. v State of New York, 73 A.D.2d 732, 423 N.Y.S.2d 289 [1979]), commercially unreasonable (see Elsky v Hearst Corp., 232 A.D.2d 310, 311, 648 N.Y.S.2d 592 [1996]; Madison Murray Assoc. v Perlbinder, 215 A.D.2d 204, 626 N.Y.S.2d 180 [1995], lv denied 88 NY2d 810, 649 N.Y.S.2d 377, 672 N.E.2d 603 [1996]) or

8

contrary to the reasonable expectations of the parties (*see 833 Northern Corp. v Tashlik & Assoc., P.C.*, 256 A.D.2d 535, 537, 683 N.Y.S.2d 111 [1998]).

Id**.**

Debtor's reading of the Contract, that January 31, 2020 (as extended to February 10, 2020) was the drop-dead closing date by which 29 Beekman would be in breach cannot be true because it would lead to commercially unreasonable results. Handwerker Report, at ¶17; Suslensky Report generally.  For example, if no Confirmation Order was in place by January 31, 2020, then, by Debtor's interpretation, 29 Beekman would be in default and lose its down payment deposit, or, arguably, in that scenario, Debtor too would be required to ignore bankruptcy requirements and convey title.  It is absurd and commercially unreasonable to think that this is what sophisticated parties to a purchase of a Property worth more than ten million dollars would intend.  Id.

Just because, in this instance, the Court had approved the sale does not render Debtor's new interpretation valid because this new interpretation could have led to an absurd case.

**D.   The Intent of The Parties to Include the 45 Days After the Confirmation Order Language Was to Make Sure 29 Beekman Had Time to Obtain Almost Ten Million Dollars Liquid**

Even without looking into the intent of the parties, it is common knowledge that even a very wealthy individual does not have ten million dollars sitting around under the mattress or in an interest bearing checking account at 1% for immediate access.  Suslensky Report, at ¶12-16; Handwerker Report, at ¶17 and generally.  There is significant time, risk and cost associated with obtaining that amount of money, and savvy buyers will not do so unless they know that there are no impediments to a sale. Handwerker Report, at ¶12-14; Suslensky Report, at ¶¶13-15.

Here, as testified to by the representative for 29 Beekman Mwafak Peress, and Seth Akabas, the attorney who represented 29 Beekman during the Contract negotiations, 29

9

Beekman specifically negotiated to have until forty-five days after the Court approved the sale so

that 29 Beekman would have sufficient time to access the money without taking the risk that the

sale would not be approved by the Court or that an approval would be appealed. Akabas Decl., at

¶¶ 2, 12, 17-29 30-31, 35; Peress Aff., Report, at ¶¶9-10;

    **E.  Debtor's Implausible and Commercially Unreasonable Reading of the
Contract Closing Language Means it Could Wait Until the Very Last Minute
to Submit a plan for Approval and Leave 29 Beekman No Time to Prepare to
Close**

By Debtor's reading of the Contract, there would be nothing stopping it from delaying its

plan, and by its reading of the closing language, 29 Beekman would be in breach because it did

not close on January 31, 2020.  Thus, Debtor's interpretation reads out of the closing language

the protection provided by scheduling a closing forty-five days after the Confirmation Order.  As

such, Debtor's interpretation is commercially unreasonable and must be disregarded as a matter

of law.  In a similar case, the court, in finding that Defendant's interpretation of one contractual

provision would render another provision in the same contract meaningless, stated:

> Defendant's interpretation of section 3.4's first condition is absurd, commercially
> unreasonable, and contrary to the reasonable expectations of the parties. It would
> render the entire provision meaningless. Defendant's reading would make
> condition (i) impossible to fulfill, and if one of the conditions precedent is
> impossible, the obligations could not be performed. Plaintiffs' interpretation is
> reasonable — the parties cannot reasonably have intended to agree to the
> performance of an impossible condition — and it gives effective meaning to the
> entire section. Accordingly, Plaintiffs' interpretation of condition (i) is the only
> "reasonable" reading of it. *See id.* There being no evidence undermining Plaintiffs'
> evidence that no foreclosure occurred, there is no genuine dispute that condition
> (i) was met.

Sasson v. Mann, No. 15-CV-6601 (CS), 2019 U.S. Dist. LEXIS 129464, at *15-16 (S.D.N.Y.

Aug. 2, 2019).

    **F.  If Any Ambiguity is Found in the Closing Language, then it Should Be Read
Against Debtor, Who Drafted the Closing Language and the Court Can also**

**Accept Extrinsic Evidence to Ascertain the Intent of the Parties During Contract Formation**

"If an ambiguity is found, 'the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'" Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002) (quoting Morgan Stanley Group Inc. v. New Eng. Ins. Co., 225 F.3d 270, 275-76 (2d Cir. 2000)).

Debtor drafted the applicable closing language in the Contract. Akabas Decl., at ¶13. To the extent the closing language is confusing, it should be construed against Debtor who drafted the closing language in question.  Id.

**G.  In Fact, the Closing Language in the Contract Should be Understood in Accordance with its Plain Meaning and without, as Debtor Would Like, Adding Any Words to It**

The Closing provision (Section 51(e)) clearly sets the date by which the parties are affirmatively obligated (45 days after entry of a Confirmation Order) by the use of standard contractual command language:  the closing "shall take place" by such date and where it "shall take place" (at the office of Debtor's counsel).  Serbagi Decl., Ex. 2.  The condition precedent provision (Section 52(d)), upon which Debtor relies, expressly states that all of the text in such provision are "conditions precedent," including the necessary condition to trigger both parties' obligation to close, i.e., that the closing occur by the "Final Date."  Id.  A contract should not be rewritten to change its plain meaning, particularly when, as in this case, that plain meaning was previously affirmed by both parties in sworn statements, and is consistent with principles of contract interpretation, with the history of the negotiations between the parties, and, as well, with the logic of standard practice in the industry.

## II.    DEBTOR'S ATTORNEYS' ACTIONS IN TRYING TO INSERT A TIME IS OF ESSENCE PROVISION IN THE SALE ORDER IS STRONG EVIDENCE THAT THEY KNEW 29 BEEKMAN HAD UNTIL 45 DAYS AFTER THE CONFIRMATION ORDER TO CLOSE

On January 16, 2020, Debtor attempted to inject a quasi "time is of the essence provision" into the Sale Order.  Serbagi Decl., at Ex. 6, at ¶15.  The language Debtor tried to rush through without comment by 29 Beekman, which the Court crossed out and initialed, states:

> ~~Time is of the essence in approving the sale of the Property, and the Debtor and the Purchaser may close the sale of the Property as soon as practicable. Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.~~ [SMB: 1/16/20]

Id.

The attempt to inject a quasi "time of the essence" clause reflects Debtor's understanding that 29 Beekman was not otherwise obligated to close until forty-five days after the Sale Order. But this posed a problem for Debtor because it knew that, solely because it had taken so long to submit a plan to the Court for approval, 29 Beekman was entitled to walk away from the deal immediately after January 31, 2020, and not be in default.  So Debtor tried to have the Court unilaterally include a legally harsh quasi "time is of the essence" clause, which, if the Court had signed, might be interpreted to have required 29 Beekman close within days of the January 16, 2020 Sale Order.

Debtor understood perfectly well that 29 Beekman did not have to close on January 31, 2020 or February 10, 2020 because it essentially makes that admission in its memorandum, where it states:

> And, even if the Final Date did not impose an affirmative duty to close, 29 Beekman cannot take advantage of a condition precedent to excuse performance, where 29 Beekman itself rendered performance impossible.

Pl's Mem., at 9-10. para 23.  This statement shows full well that Debtor knew that 29 Beekman had no obligation to close on what the Contract calls the Final Date, and it knows full well that it was not 29 Beekman that made performance impossible. Indeed, performance was never impossible until Debtor elected to abandon the deal -- as shown herein, 29 Beekman did everything possible to make the deal work.

**III.    EVEN UNDER DEBTOR'S IMPLAUSIBLE READING OF THE AGREEMENT, 29 BEEKMAN DID NOT DEFAULT BECAUSE THE AGREEMENT HAS NO TIME IS OF THE ESSENCE PROVISION AND DEBTOR DID NOT SEND A TIME IS OF THE ESSENCE LETTER AFTER FEBRUARY 10, 2020, IT JUST REPUDIATED**

While Debtor is clearly wrong as a matter of law that 29 Beekman had to close on February 10, 2020 or be in default, even if we accept Debtor's argument as true, its repudiation on February 18, 2020 without having sent a time is of the essence letter on February 11, 2020 or thereafter was impermissible.   Handwerker Report, at ¶¶18-19; Suslensky Report ¶10.

It is fundamental that time is never of the essence of a contract for the sale of real property unless the contract specifically so provides or special circumstances surrounding its execution so require. Tarlo v. Robinson, 118 A.D.2d 561, 565-566 (2nd Dep't 1986).  In the absence of a contractual provision making time of the essence, one party may subsequently give notice to that effect.  76 North Associates v. Theil Management Corp., 114 A.D.2d 948, 949 (2d Dep't 1985).  *(Taylor v Goelet*, 208 NY 253; *Garry v Edmann Homes*, 12 Misc 2d 1032; 1A [Part 2] Warren's Weed, New York Real Property, Closing of Title, § 404 [2] [4th ed]). The notice must be clear, distinct and unequivocal and must fix a reasonable time within which to perform *(Ballen v Potter*, 251 NY 224; *Mader v Mader*, 101 AD2d 881; *Ring 57 Corp. v Litt*, 28 AD2d 548). It is well established that a party may make time of the essence as to a closing date in a contract for sale, where time was not made so in the contract itself or in a valid subsequent

agreement, by issuing a clear and unequivocal notice to that effect giving the other party a reasonable time in which to act. M. Carl Levine, Morgulas & Foreman v. Canpro Invest., Ltd., 1990 U.S. Dist. LEXIS 5890, *10-*11 (S.D.N.Y. 1990); Tarlo v. Robinson, 118 A.D.2d 561, 565-566 ("The amount of time that constitutes a "reasonable time" must be determined by the facts and circumstances of each case").

Further, in cases where a party has sent a time of the essence notice, it is always after the original not-of-the-essence closing date has passed. *North Triphammer Dev. Corp. v. Ithaca Associates, 704 F. Supp. 422, 430 (S.D.N.Y. 1989) (*"No case has been cited, and none has been found, where time was unilaterally made of the essence of a contract before the date set forth in the contract has passed.") (citing See, e.g., Zev v. Merman, 134 A.D.2d 555, 521 N.Y.S.2d 455 (2d Dep't 1987), app. gr., 72 N.Y.2d 802, 530 N.Y.S.2d 554, 526 N.E.2d 45 (1988); Mazzaferro v. Kings Park Butcher Shop, 121 A.D.2d 434, 503 N.Y.S.2d 134 (2d Dep't 1986)).

Here, there was no time is of the essence provision in the contract (even though Debtor tried to sneak one in by Court Order). Serbagi Decl., Ex. 6, at ¶15. Debtor admitted this in its February 18, 2020 letter that 29 Beekman had until February 15, 2020 to close. Id. at Ex. 1. Debtor sent a time of the essence letter on January 30, 2020 which it re-sent on January 31 and they both demanded closing on February 10, 2020. Serbagi Decl., Ex. 7. First, the letters wrongly identified the date by which 29 Beekman had to close, as we have discussed. Second, those letters were legally invalid and indeed meaningless because Debtor sent those letters long before the time of closing even by Debtor's false position, much less the real date 29 Beekman had to close.

The Contract does not say that Debtor is entitled to retain the down payment merely because 29 Beekman does not close on a certain date, which is really what Debtor is arguing

here.  The Contract limits Debtor's remedy to a "default" of the Purchase Agreement.  Serbagi

Decl., Ex. 2, at §20 ("If Purchaser **defaults** hereunder, Seller's sole remedy shall be to receive

and retain the Downpayment as liquidated damages . . .." (emphasis added)).  Accordingly,

because, even under Debtor's commercially unreasonable interpretation of the Contract, 29

Beekman did not breach, Debtor is not entitled to retain the down payment.

IV.    **29 BEEKMAN DID NOT HAVE TO CLOSE AT ANY TIME BECAUSE DEBTOR
DID NOT MEET CRITICAL CONDITIONS TO CLOSING PRIOR TO
DEBTOR'S FEBRUARY 18, 2020 REPUDIATION LETTER**

A.    **29 Beekman Did not Have to Close Because Debtor Did Not Meet the
Conditions to Closing Section of the Contract, Which Provides that Debtor's
Representations As to "All Claims" Be True at the Date of Closing**

It is well settled that the failure of a condition precedent in a real estate Contract excuses

the parties from performance.  Serdarevic v. Centex Homes, LLC, 2012 U.S. Dist. LEXIS

179576, *6 (S.D.N.Y Nov. 7, 2012) ("Defendant's performance, however, is nonetheless excused

because the town's zoning law caused a failure of a condition precedent to closure"); In Esquire

Trade & Fin., Inc. v. CBQ, Inc., 2009 U.S. Dist. LEXIS 105417, *5-6 (S.D.N.Y Nov. 5, 2009)

(Holding that despite Plaintiff's allegation that the Defendant breached its obligation to reissue

certain shares, the parties failure to meet conditions precedent in an escrow agreement meant that

Plaintiffs had "not sustained their burden of proving that [defendant] breached a contractual

obligation to Plaintiffs.")

The Contract clearly stated that the Seller's "representations and warranties must be true

at closing."  In particular, the Contract states:

**Conditions to Closing**.

13(b) This contract and Purchaser's obligation to purchase the Premises are also
subject to, and conditioned upon, the fulfillment of the following conditions
precedent:  (i) The accuracy, as of the date of Closing, of the representations and
warranties of Seller made in this contract.

Serbagi Decl., Ex. 2. One of the representations referred to in the Conditions to Closing that would have to be true <u>as of Closing</u> is Debtor's representation in the paragraph entitled Bankruptcy Matters and Closing, which states in part:

> **Bankruptcy Matters and Closing**
>
> **51(b) Seller represents that the net proceeds of a sale under this Contract would be sufficient to satisfy all claims against Seller** and, as reasonably projected, Seller's contemplated estate in bankruptcy, and Seller shall present the Contract for approval by the Bankruptcy Court in such context.

Serbagi Decl., Ex. 2, at §51b.  Accordingly, taking Sections 13b and 51b together, for 29 Beekman to have any obligation to close, it must be true at closing that the proceeds of the sale would be sufficient to satisfy "all claims" against Debtor (the "All Claims Condition Precedent").  The All Claims Condition Precedent was, moreover, critical to protection of 29 Beekman's position that it would be obligated to close only under a bankruptcy plan that sailed through approval, as Debtor and its attorneys had promised. Peress Aff., at ¶6; Akabas Decl., at ¶¶12, 14-17.  Debtor offers no basis whatsoever as to why the express terms of the All Claims Condition Precedent should be simply read out of the Contract.

Despite the Conditions for Closing, it is undisputed between the parties that on December 31, 2019, Debtor's sole shareholder, Pelmadulla, submitted a proof of claim in the amount of $3,243,941.19, about three months after the parties executed the Contract, and less than three months after filing for bankruptcy (the "Pelmadulla Claim").[2]  Serbagi Decl., Ex. 8. Pelmadulla states that it made <u>51 advances</u> from Pelmadulla <u>to Debtor</u> pursuant to a Loan Agreement from <u>April 15, 2011- September 25,2017</u>.  <u>Id.</u> at Ex. A

---

[2] Such filing was also, suspiciously, within hours of the deadline for filing claims while Debtor's and Pelmadulla's counsel, Blank Rome, was still awaiting approval of its November 2019 request to withdraw as long-term counsel of record for Pelmadulla in a New York State litigation with judgment creditor Azari.

16

Accordingly, by the plain terms of the Contract, which required as a condition precedent that all representations be true at time of closing (Serbagi Decl., Ex. 2, at §8(b)), and one of those conditions was the All Claims Condition Precedent, <u>neither party had any obligation to close</u>.  To this date, Debtor has still not met the conditions to close.

1. **Instead of Trying to Work With 29 Beekman in Good Faith to Fix its Failure to Be Able to Satisfy "All Claims" at Closing, Debtor Ran to Court to Rush Through a 363 Sale While Ignoring the Pelmadulla Claim**

When Pelmadulla filed its claim on December 31, 2019, Debtor knew it had a problem because it had represented to 29 Beekman in the Contract that the proceeds of the sale would be sufficient to satisfy all claims at the time of Closing. (Serbagi Decl., Ex. 2, at §8(b)).  There was now a claim that made Debtor's representation false (we note again that the representation was not qualified by Debtor's knowledge, materiality, or in any other way).  Debtor also knew that if it did not close by January 31, 2020, 29 Beekman had the option to walk away from the deal (and not be in breach).  As set forth herein, only forty-five days after the Confirmation Order would 29 Beekman be legally obligated to close.

Instead of working to resolve the Pelmadulla Claim, Debtor rushed to Court one week later, and filed a motion for the Court to approve a 363 Sale. Serbagi Decl., Ex. 9. The Court entered the Order on January 16, 2020 (Serbagi Decl., Ex. 6), and it became non appealable on January 31, 2020.  Whatever the impact of the Court's January 16, 2020 Order, which we will discuss in a separate section, Debtor never satisfied the "All Claims Condition Precedent" for closing.  Accordingly, even if Debtor is right that the Court's January 16, 2020 Sale Order meant that all of Debtor's prior conduct was somehow in compliance with the Contract, the Court certainly did **<u>not</u>** hold that Debtor had met all the conditions for closing set forth in the Contract,

17

or that such condition would in the future at closing be waived. Debtor made no such request to the Court. In fact, the Sale Order stated:

### 3. Approval

The Purchase Agreement and all of the terms and conditions therein are approved. The Debtor is hereby . . . directed to . . . comply with the terms of the Purchase Agreement

Serbagi Decl., Ex. 6, at ¶ 3 To this date, Debtor has still not met the conditions for closing. Because Debtor was so singularly focused on obtaining 29 Beekman's million dollar down payment rather than dealing with the Pelmadulla Claim, Debtor waited until April 22, 2020 to contest the validity of that claim in Court. Serbagi Decl., Ex. 10. It waited this long even though it told the Court at the January 14, 2020 hearing that "[Obviously, this was a claim that the Debtor would be disputing."] Serbagi Decl., Ex. 11, at 3:12-22. Pelmadulla filed its claim on December 31, 2019, which means that Debtor waited almost four months to contest the claim[3] Debtor's four-month delay in contesting the Pelmadulla Claim speaks to Debtor's disinterest in actually making the deal work as opposed to contesting it when it arose so it could meet the conditions of closing. If not bad faith, this clearly demonstrates a disinterest in meeting the conditions of closing.

The only relevant factor is that the Pelmadulla Claim existed and because it existed, and because Debtor in effect represented it would not exist as of closing as a condition to closing, 29 Beekman had no legal obligation to close until that condition was satisfied. The Sale Order had no impact on this -- the Sale Order cannot say and is not meant to say that Debtor has met all the conditions of closing. Accordingly, before we even get to the other multiple reasons Debtor is not entitled to liquidated damages, 29 Beekman must prevail because it did not have to close

---

[3] Indeed, Debtor did not even file an objection to the Pelmadulla Claim until **after** the Court had denied judgment creditor Azari's motion to dismiss on the grounds of the lack of a triggering creditor.

until 45 days after the Confirmation Order and because Debtor did not meet the Conditions for

Closing at any time during that period, even ignoring 29 Beekman's right to walk away after the

Final Date.

**V.     DEBTOR'S ARGUMENT THAT 29 BEEKMAN ANTICIPATORILY BREACH
THE CONTRACT IS FRIVOLOUS BECAUSE THE LAW DOES NOT SUPPORT
THE CLAIM AND DEBTOR DID NOT TREAT 29 BEEKMAN'S STATEMENT
AS A BREACH**

The Second Circuit has stated: Under well-settled principles of New York contract law,

an anticipatory "repudiation can be either a statement by the obligor to the obligee indicating that

the obligor will commit a breach" of an agreement "or a voluntary affirmative act which renders

the obligor unable or apparently unable to perform without such a breach." (citing Briarwood

Farms, Inc. v. Toll Bros., Inc., 2011 U.S. App. LEXIS 25595, *4 (2d Cir. Dec. 22., 2011)).

Such a "repudiation can be determined to have occurred only when it is shown that 'the

announcement of an intention not to perform was positive and unequivocal." Id. at *5 (emphasis

added) (quoting DiFolco v. MSNBC Cable L.L.C., 622 F.3d at 112 (quoting Tenavision, Inc. v.

Neuman, 45 N.Y.2d 145, 150, 379 N.E.2d 1166, 408 N.Y.S.2d 36, 38 (1978)).   The Briarwood

court stated that there must be a "positive and unequivocal repudiation" to constitute a breach.

Id. (citing Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d at 463, 682

N.Y.S.2d at 667 (noting "serious consequences" to party that elects to treat less than certain or

equivocal communications as anticipatory repudiation). The issue may be decided as a matter of

law so long as there is no ambiguity as to the writing's meaning. Id. at *6 (emphasis

added)(citing Hartford Accident & Indem. Co. v. Wesolowski, 33 N.Y.2d 169, 172, 305 N.E.2d

907, 350 N.Y.S.2d 895, 898 (1973)).

The Second Circuit has also set forth the parameters for how a party must respond to

what it considers to be an anticipatory breach. As stated by Consist Software Solutions, Inc. v.

Software AG, Inc., 2009 U.S. App. LEXIS 6549 (2d Cir. 2009), under New York law, "when

one party breaches an executory contract, the adverse party has a choice - to treat the entire

contract as broken and sue immediately for the breach or reject the proposed breach and continue

to treat the contract as valid." Id. at *3 (citing *Inter-Power of N.Y., Inc. v. Niagara Mohawk*

*Power Corp.,* 259 A.D.2d 932, 934, 686 N.Y.S. 2d 911 (3d Dep't 1999); *see also Emigrant*

*Indus. Savings Bank v. Willow Builders, Inc.,* 290 N.Y. 133, 144, 48 N.E.2d 293 (1943) ("Where

a contract is broken in the course of performance, the injured party has a choice presented to him

of continuing the contract or of refusing to go on." (internal quotation marks omitted)).

Moreover, under an anticipatory repudiation theory, a plaintiff who elects to treat a

repudiated contract as valid does not have an action against the repudiating party until an actual

breach occurs. Lucente v. IBM, 310 F.3d 243, 259 (2d Cir. 2002) (citing Franconia Assocs., 122

S. Ct. 1993, 2002 (2002)).

Turning to the facts here: **Debtor falsely states the following in its brief:**

> 29 Beekman on January 15, 2020, expressly stated it is "withdrawing from
> any further voluntary participation in a pre-plan 363 sale" **and would not close
> on the sale of the Townhouse.**

Pl's Mem, at 7 (emphasis added).  Debtor does here what it does throughout its brief -- it

selectively quotes out of context and then characterizes in the next sentence, as if the

characterized statement, because it is next to the quoted statements, is what was actually stated.

Debtor never stated that it "would not close on the sale of the Townhouse."  That is simply

untrue.

Here is a proper summation of the points made in 29 Beekman's January 15, 2020 letter:

- Second Paragraph: A paragraph description of how 29 Beekman has become
  uneasy because of the new claims Debtor did not disclose (referring to the
  Pelmadulla Claim) and uneasy with allegations by third parties that 29 Beekman
  may have colluded in some way with Debtor.

20

- Third Paragraph: 29 Beekman wanted to proceed quickly and stated that it had previously agreed to do the sale in bankruptcy only because it would save a significant amount on the mansion tax and previously agreed to language that it would proceed by a 363 Sale only if a plan was not possible.  29 Beekman noted that the parties negotiated so that the closing would not proceed past January 31, 2020 without the buyer's consent.[4]

- Fourth Paragraph: 29 Beekman asserts that a plan is still possible even though it may be inconvenient for Debtor, that Debtor conceded as much when it expressly requested a 45 day extension of the January 31, 2020 deadline to close, and that, in light of the new claim, 29 Beekman would want the right to opt out of the plan if it was unacceptable.

- Fifth Paragraph:  29 Beekman asserts that it accommodated Debtor's request to proceed by a 363 Sale on the condition that 29 Beekman not have to pay the mansion tax; and that this condition was reflected in 29 Beekman's first round of comments to the Sale Order, which edit Debtor accepted in a counter draft, and it was only when yet another new draft was circulated by Debtor, that it omitted the language that Debtor would pay the mansion tax.

- Buyer actually affirmed its obligations under the Contract by stating:

  Sixth Paragraph: As noted above, this back and forth is part of what has become very troubling to the buyer. **The buyer stands by its obligations under the contract of sale if a plan is confirmed by a confirmation order reasonably acceptable to buyer that is final and non-appealable in time for a closing by the current deadline, January 31, 2020.** If not, then buyer's position under the contract of sale would remain as a contract party with an option to buy the property under a plan or a 363 sale in buyer's sole discretion. That position would be exactly what buyer expressly negotiated to get in this scenario of unforeseen setbacks. Buyer, however, does not want to exert that right because its exertion would further complicate the bankruptcy and might well result in no benefit to buyer and significant impediments to seller. Also, buyer has directed its preference that I not testify about the facts of the negotiation, mainly because I was not part of the negotiation of the critical $10,300,000 purchase price.

- Seventh and Final Paragraph: In that context, after already having affirmed its obligations to close with a reasonable plan, 29 Beekman stated:

  So, although the buyer is not willing to extend the January 31, 2020 deadline, the buyer will elect to terminate the contract of sale if a bankruptcy plan is not final and non-appealable in time for a closing to occur by the current deadline, January

---

[4] 29 Beekman counsel was referring to the January 31 date as one that it had the right, not the obligation, to extend.

31, 2020. Buyer will await that outcome, but is withdrawing from any further voluntary participation in a pre-plan 363 sale.[5]

Serbagi Decl., Ex. 12.

### A. Debtor Makes a Material Misrepresentation When it States that 29 Beekman "would not close on the sale of the Townhouse."

As the Court can see from 29 Beekman's January 15, 2020 letter (Serbagi Decl., Ex. 12), 29 Beekman never stated that it would "not close on the sale of the Townhouse," as Debtor states in its memorandum of law.  Pl's Mem., at 7.  In fact, in the very January 15, 2020 letter that Debtor cites, Debtor's counsel stated:

> The buyer stands by its obligations under the contract of sale if a plan is confirmed by a confirmation order reasonably acceptable to buyer that is final and non-appealable in time for a closing by the current deadline, January 31, 2020.

Serbagi Decl., Ex. 12.

### B. Debtor's Anticipatory Breach Argument is Frivolous Because the Day After 29 Beekman's Letter, Debtor Treated the Contract as Valid and Unassailable and Asked the Court to Approve Assumption of it, Which it Did

As stated above, "when one party breaches an executory contract, the adverse party has a choice - to treat the entire contract as broken and sue immediately for the breach or reject the proposed breach and continue to treat the contract as valid." Consist Software Solutions, Inc. v. Software AG, Inc., 2009 U.S. App. LEXIS 6549, *3 (2d Cir. 2009).  A plaintiff who elects to treat a repudiated contract as valid does not have an action against the repudiating party until an actual breach occurs. Lucente, 310 F.3d at 259.  As this Court stated in Empire State Bldg. Co., L.L.C. v. New York Skyline, Inc. (In re New York Skyline, Inc., 432 B.R. 66, 82 (Bankr. S.D.N.Y 2010),

---

[5] In addition, 29 Beekman's remark in this letter about withdrawing from "voluntary" participation occurred in the context of a series of emails and conversations between Debtor's counsel and 29 Beekman's counsel, in which Debtor's counsel had requested 29 Beekman's counsel to voluntarily attend the hearing and voluntarily testify if requested as to the arms-length nature of negotiations, which 29 Beekman's counsel had until that point voluntarily agreed to do.

Accordingly, the Court concludes that Skyline's assumption of the May 2005 Agreement at a time when it knew of the facts that formed the basis of its rescission claim constitutes a ratification of the May 2005 Agreement that bars the rescission claim

Id. ("a debtor who wishes to pursue a cause of action to rescind a contract should "obviously not assume it.")

1. **Immediately After 29 Beekman's Letter, Debtor Asked the Court to Hold Valid and Approve Debtor's Assumption of the Contract, Behavior Directly Inconsistent with Claiming Anticipatory Breach**

Debtor now argues 29 Beekman anticipatorily breached by its January 15, 2020 letter, stating it would not "voluntarily" participate further. Pl's Mem., at 7, para 15.  First, rather than claiming that 29 Beekman anticipatorily breached after 29 Beekman's January 15, 2020 letter, suing, and treating the contract to be broken, as required by law, Debtor wrote to the Court on the same day. Serbagi Decl., Ex. 13.  Rather than stating that 29 Beekman breached and Debtor was electing to sue, Debtor stated that it would go forward with the Sale Order hearing, which was on January 16, 2020.  Id. As stated in Debtor's motion papers, the purpose of that hearing was to hear Debtor's request in its motion papers that the Court approve assumption of the Contract.  Debtor stated:

> By this Motion, pursuant to sections 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004, and the Sale Guidelines, the Debtor seeks entry of the Sale Order, authorizing and approving (i) assumption of the Contract, and (ii) the sale of the Property to the Purchaser, free and clear of liens, claims, interests and other encumbrances, with any such liens, claims, interests and encumbrances attaching to the proceeds of the sale.

Serbagi Decl., Ex. 9, at 10, ¶29.  The motion papers were replete with representations that the Contract was valid and that the Court should approve assumption of it.  Id. at pp. 10-16.

In particular Debtor stated:

> "The Debtor believes that it would be a mistake to abandon the Contract, and create a contract rejection damage claim with no alternative transaction in sight.";

23

Id. at 13, ¶ 36).  Debtor now tells this Court that 29 Beekman anticipatorily breached, but at the time it told the Court that the Court should approve assumption of the Contract as perfect.

The very purpose of the Sale Order hearings on January 14 and January 16 (one day after 29 Beekman's supposed anticipatory breach) was to approve assumption of the Contract and sale -- conduct directly contrary to Debtor's claiming anticipatory breach.  At Debtor's request, the Court executed the Sale Order on January 16, 2020, whereby it expressly approved assumption of the Contract and sale. Serbagi Decl., Ex. 6. Rather than "to treat the entire contract as broken and sue immediately for the breach or reject the proposed breach and continue to treat the contract as valid," Debtor took multiple actions to confirm it.  Consist Software Solutions, Inc. v. Software AG, Inc., 2009 U.S. App. LEXIS 6549, *3 (2d Cir. 2009).  A plaintiff who elects to treat a repudiated contract as valid does not have an action against the repudiating party until an actual breach occurs.  Lucente, 310 F.3d at 259.

Under these circumstances, for Debtor to say that it considered the Contract to be anticipatorily breached is incredible.

**2.  Debtor's Time is of the Essence Letters, Albeit Invalid, Were Also Inconsistent with its New Claim of Anticipatory Repudiation**

On January 30 and January 31, 2020, Debtor sent letters to 29 Beekman demanding that it close on February 10, 2020.  Serbagi Decl., Ex. 7. While those letters were legally ineffective, they negate Debtor's current position of anticipatory breach, which legal theory required Debtor to "treat the entire contract as broken and sue immediately for the breach or reject the proposed breach and continue to treat the contract as valid." Consist Software, 2009 U.S. App. LEXIS 6549, at *3. Debtor neither treated the Contract as broken nor in any way rejected the (now) claimed 29 Beekman repudiation; nor did Debtor even bother to share the view it now claims it

held then (i.e., of an anticipatory breach) with either the Court or the other interested parties in

making its request to the Court to approve assumption of the Contract.

### C. 29 Beekman Expressly Stated that it Would Perform Under the Contract as Long as Debtor Did Not Treat 29 Beekman's January 15 letter as a repudiation

Putting aside that Debtor's actions after 29 Beekman's January 15, 2020 letter negated

any claim for anticipatory repudiation, 29 Beekman January 15 letter itself was a far cry from the

"unequivocal intention not to perform that is required by the case law." Serbagi Decl., Ex. 12.

First, the letter is clearly a reflection on the discomfort that 29 Beekman's attorney was

having with the undisclosed new Pelmadulla Claim and the increased cost of $334,750[6] that a

purchase through a 363 Sale would add to the deal, which was quite understandable and

reasonable.  Second, even given the new claims, Debtor stated that it **would** perform under the

contract.  29 Beekman stated:

> [t]he buyer stands by its obligations under the contract of sale if a plan is confirmed by a confirmation order reasonably acceptable to buyer that is final and non-appealable in time for a closing by the current deadline, January 31, 2020."

Serbagi Decl., Ex.12.  Accordingly, far from treating the Contract as broken, Debtor affirmed it.

### D. Even the Meaning of the Single Quotation Debtor Provided Just Meant that Buyer Would Not "Voluntarily" Help Debtor Obtain a 363 Ruling that Would Cost 29 Beekman an Extra $334,750

Debtor is essentially claiming that 29 Beekman breached anticipatorily by informing

Debtor that Buyer would stop voluntary participation in the application for the Sale Order.

---

[6] The "Mansion Tax" in New York City on residential home sales in the price range of $10,000,000 to $14,999,999 is 3.25% total between New York State and New York City components, so, on a $10,300,000 sale, it would ordinarily be $334,750.  The sale transaction is exempt from the "Mansion Tax" if it is completed pursuant to a Chapter 11 Bankruptcy Plan adopted under the U.S. Bankruptcy Code (Title 11 of the United States Code).  The transaction is not exempt if it is a pre-plan sale pursuant to Section 363 of the Bankruptcy Code.

Debtor did not state it would not follow the Sale Order.  29 Beekman never repudiated its

<u>mandatory</u> obligations under the Contract of Sale.

**VI.     29 BEEKMAN ACTED IN GOOD FAITH TO MAKE THE DEAL WORK, IT
         EXTENDED THE FINAL DATE AND TRIED TO REACH COMPROMISE
         WITH DEBTOR ON MULTIPLE FRONTS, ALL THE WHILE EXPRESSLY
         RESERVING ITS RIGHT TO ARGUE THAT DEBTOR FAILED TO MEET THE
         CONDITIONS OF CLOSING**

        29 Beekman would have been entitled to walk away from the deal entirely after January

31, 2020 because of Debtor's failure to meet the condition precedent of a closing by the Final

Date.  By January 31, 2020, 29 Beekman was unable to close on such short notice because it

needed time to obtain liquid funds and had at least until March 1, 2020 to close (45 days after

entry of the Sale Order).  Akabas Decl., at ¶2-19.  The correspondence cited below shows that it

tried to make the deal work.  Beekman honestly wanted the deal to work and what Debtor falsely

portrays as bad faith is incredible good faith, which Debtor is trying now to use against 29

Beekman.

        First, instead of walking away from the deal, as it was entitled to do, 29 Beekman

extended the deal to February 10, 2020 by email dated January 29, 2020, to see if the parties

could construct a mutually agreeable plan.  Serbagi Decl., Ex. 14. Second, instead of walking

away from the deal, as it was entitled to do, 29 Beekman offered by letter dated January 22, 2020

to waive Debtor's failure to meet the closing condition precedents if it would pay the mansion

tax. <u>Id.</u>, Ex. 15 at n. 1 and again when 29 Beekman submitted its comments on a draft Sale

Order. (Ex. 16, ¶4. Third, instead of walking away from the deal, as it was entitled to do, 29

Beekman offered to extend the date to close so interested third parties might purchase the

Property. Serbagi Decl., Ex. 17.  Fourth, instead of walking away from the deal, as it was entitled

to do, 29 Beekman finally offered to extend to May 10, 2020 to give Debtor plenty of time to get

approval of a modified bankruptcy plan. Serbagi Decl., Ex. 18. That was not a breach and Debtor

does not say it was a breach.  See Handwerker Expert Report, at ¶10.

Finally, 29 Beekman was not in default merely by suggesting an alternative date so that

the parties could come to mutual terms.  First, that is not what the law provides.  Tarlo v.

Robinson, 118 A.D.2d 561, 566 (2d Dep't 1986) ("When there is an indefinite adjournment,

some affirmative act has to be taken by one party before he can claim the other party is in

default; that is, one party has to fix a time by which the other must perform, and he must inform

the other that if he does not perform by that date, he will be considered in default") (citations

omitted).  Second, that is not the standard in the industry.  Handwerker Decl., at para 20.

## VII.    DEBTOR CONTINUALLY ACTED IN BAD FAITH AND WITH A SINGLE MINDED AND OVER-ZEALOUS PURPOSE OF OBTAINING 29 BEEKMAN'S DOWN PAYMENT AND COUNTING ON THE BANKRUPTCY COURT TO RULE IN ITS FAVOR, AS DEBTOR

Some examples wher Debtor has acted in bad faith throughout its dealings with 29

Beekman, include:

First, instead of timely filing a bankruptcy plan promptly after filing the petition, as Debtor and its counsel had separately assured would be done, and as was necessary to meet the timing for a mandatory closing under the Contract, Debtor delayed and delayed filing the plan almost two months later so that the timing for the closing could not be met before the Final Date.  Akabas Decl., at ¶20.

Second, instead of timely objecting to the Pelmadulla Claim, or working to settle it and the Azari judgment, Debtor rushed to Court a week after the Pelmadulla Claim was filed to force a 363 sale. Serbagi Decl., Ex. 9.

Third, Debtor refused to pay the mansion tax to make the deal work, even though it was solely Debtor's failure to disclose the Pelmadulla Claim that led to the possibility of losing the exemption from the mansion tax. Id. at Exs. 15-16.

Fourth, Debtor refused to let 29 Beekman comment on the Sale Order before it submitted it for the Court's approval. Id. at Ex. 19.

Fifth, Debtor affirmatively opposed 29 Beekman's request for a conference on the date of entry of the Sale Order so it might be amended the same day, and, when the conference

27

was held the next day, Debtor argued that the date was too late to amend the Sale order. Akabas Decl., at ¶28d;

Sixth, when 29 Beekman urged Debtor to continue with modifying its bankruptcy plan to enable the sale of the Property to 29 Beekman with an auction as an alternative (Serbagi Decl., Ex 12), Debtor refused (Id. at Ex. 20)  demanding closing and not indicating any modification to plan) (but has since informed the Court that it will proceed with just the auction).  Id. at Ex. 21, at 18:3-19:25.

Seventh, when 29 Beekman offered to accede to Debtor's multiple requests to extend the Final Date to allow the modification of the bankruptcy plan while maintaining 29 Beekman's obligation to purchase, Debtor refused and chose, itself, to abandon the deal under the Contract.  Serbagi Decl., Ex. 2.

## VIII.   IT WAS DEBTOR THAT WALKED AWAY FROM THE DEAL TO TRY AND GET A BETTER OFFER AND HOLD 29 BEEKMAN IN BREACH

A critical point for the Court to consider is that no matter how confused Debtor was about the closing date, as reflected by the many different positions it took, **it was not 29 Beekman that walked away from the deal** -- it was Debtor, who, on February 18, 2020, long prior to the date 29 Beekman had to close, stated that the following:

> Debtor hereby exercise [*sic*] its right to terminate the Purchase Agreement and to retain the Downpayment as liquidated damages.

Serbagi Decl., Ex. 1.  Debtor cannot reasonably argue that 29 Beekman did not try to make the deal work given that it was Debtor that abandoned the deal in an effort instead to keep money 29 Beekman entrusted with Blank Rome.

## IX.   29 BEEKMAN DID NOT OBJECT TO THE SALE ORDER AND THE COURT STATED MANY TIMES THAT IT DID NOT WANT TO DEAL WITH THE ISSUE OF DEBTOR'S PRIOR CONDUCT

### A.   THE SALE ORDER EXPRESSLY REQUIRED THAT DEBTOR MEET THE CONDITIONS OF THE CONTRACT

The Court did not rule in the Sale Order that Debtor was excused from complying with the terms of the Contract.  Serbagi Decl., Ex. 6.  On the contrary, the Sale Order expressly

directed Debtor to comply with the terms of the Contract. In particular, the Sale Order states, in

relevant part:

> **3. Approval.** The Contract and all of the terms and conditions therein
> are approved. The Debtor is hereby authorized and directed to (i) assume the Purchase
> Agreement; (ii) perform its obligations under and comply with the terms of the Purchase
> Agreement and execute and perform any additional agreements, instruments or
> documents that may be reasonably necessary or appropriate to implement the Contract;
> (iii) consummate the sale of the Property in accordance with the terms and conditions of
> the Contract; and (iv) take all other and further actions as may be reasonably necessary or
> appropriate to implement the sale of the Property and perform its obligations under the
> Contract. The provisions of this Order authorizing the sale of the Property free and clear
> of Interests, except as otherwise set forth in the Contract or this Order, shall be self-
> executing, and neither the Debtor or the Purchaser shall be required to execute or file
> releases, termination statements, assignments, consents, or other instruments in order to
> effectuate, consummate and implement the provisions of this Order. However, the
> Debtor, the Purchaser, and each of their respective officers, directors, employees, agents,
> and representatives are hereby authorized and empowered to take all actions and execute
> and deliver any and all agreements, instruments and documents that the Debtor or the
> Purchaser deem necessary or appropriate to implement and effectuate the terms of the
> Contract and this Order.

Serbagi Decl., Ex. 6, at 4.

> **Section 8. Binding Effect of Order.** The terms and provisions of the Contract and this
> Order shall be binding in all respects upon the Debtor, the Debtor's estate, the Purchaser,
> all creditors of the Debtor, all holders of equity interests in the Debtor, and all other
> parties in interest.

Id. at Sec.8.

> The failure to reference or specifically include any particular provisions of the Purchaser
> Agreement in this Order shall not diminish or impair the effectiveness of such provisions,
> it being the intent of the Court that the Purchase Agreement and the sale of the Property
> be authorized and approved in its entirety.

Id. at Sec. 14.

First, the Sale Order did not change the terms of the Contract regarding closing -- it

affirmed them and directed Debtor to comply.

Second, the Sale Order did not alter any of the requirements or conditions of the Contract

-- in fact it confirmed "all of the . . . conditions."

29

Third, the Sale Order did not change the closing dates of the Contract, it confirmed them.

Finally, the Sale Order did not even state that the Court required 29 Beekman to purchase the Property under any particular conditions except those that are in the Contract.

By arguing that it is relieved from the burdens of the Contract, Debtor seems to argue that the Court's Sale Order is final as to 29 Beekman, but not applicable to Debtor, but that result is precluded by this Court's prior decisions.  Empire State Bldg. Co., L.L.C. v. New York Skyline, Inc. (In re New York Skyline, Inc.), 432 B.R. 66, 77 (Bankr. S.D.N.Y. 2010) ("When the debtor assumes the lease or the contract under § 365, it must assume both the benefits and the burdens of the contract.").

### B.  29 BEEKMAN PUT DEBTOR ON NOTICE OF ITS VARIOUS BREACHES

The Sale Order was not intended to and did not address any breaches or allegations of breaches between the Contract's parties.  Debtor's assertion that the Court has in any way already, through its orders or otherwise, ruled on the issues of default under the Contract, is belied by the Court's own statements on record, including the following statements at the February 21, 2020 oral argument.  The Court repeatedly and over time stated that it did not want to hear arguments concerning breach.  Serbagi Decl., Ex. 21, at 5:7-20; 9:6-9; 9:24-10:2; 11:24-12:4).  And, finally, the Court concluded toward the end of the hearing: "Well, it would be a dispute on (inaudible) contract at this point.  In other words, it's really what are the obligations I guess of Blank Rome with respect to the deposit, which turns under the assumed contract, which turns on I guess who is in breach." Id. at 22:19-23. Clearly, the Court did not believe that it had already relieved Debtor of any of its prior conduct and certainly did not rule on whether that prior conduct was in compliance with the Contract.  See Brown Media Corp. v. K&L Gates, LLP, 854 F.3d 150, 163 (2d Cir. 2017) (A Section § 363 sale "protects the reasonable

expectations of good faith third-party purchasers by preventing the overturning of a completed sale").

Moreover, Beekman properly objected to Debtor's breach of the Contract following the end of the Sale Order hearing. Serbagi Decl., at Exs. 12; 19.  Debtor breached by submitting a substantially revised proposed Sale order to the Court without allowing 29 Beekman's prior review and approval of the Sale Order (Serbagi Decl., Ex. 19), as expressly required in the Contract.  Id. at Ex.2, at 1 ("Purchaser acknowledges that the Seller will incorporate this contract into its Plan, or, if necessary, a 363 Sale, to be approved by the Bankruptcy Court as a sale that would generate sufficient new proceeds to satisfy all claims **in a form mutually and reasonable acceptable to Purchaser and Seller.**") (emphasis added).  Debtor also included in its proposed Sale Order a time is of the essence provision, which the Court properly deleted.  Id. at Ex. 6, ¶ 15. Although the Court did act to partially protect 29 Beekman's interest, 29 Beekman was entitled to review, edit, and approve the proposed Sale Order before submission.

## X.   DEBTOR'S FAILURE TO DISCLOSE THE PELMADULLA CLAIM CONSTITUTED BREACH AND FRAUD IN THE INDUCEMENT

Literally minutes before this filing, the undersigned counsel received a phone call from legal counsel for Pelmadulla who filed the Pelmadulla Proof of Claim at Serbagi Ex. 8. Serbagi Decl., at ¶32.  Pelmadulla counsel represented to the undersigned that it had in its hands a tax return from Debtor in 2011, which tax return directly states: "Loans from Stockholders – $10,816,579." Id.  This tax treatment indicates that Debtor knew and in fact recognized that it had taken loans from Pelmadulla, who is Debtor's sole shareholder.  Id. In contrast to that binding admission, Debtor repeatedly told this Court tells this Court just recently that it had no knowledge of any loan and in fact that it did not exist, and it said this knowing it was wrong. Serbagi Dec., Ex. 10, at  ¶¶ 10-14; Ex. 11, 3:12-25.

"Rescission involves a power under state law to avoid a contract by disaffirming it. <u>See</u> DAN B. DOBBS, LAW OF REMEDIES § 4.3(6), at 614 (2d ed. 1993) ("A rescission is the avoidance of a transaction."); 1 JOSEPH M. PERILLO, CORBIN ON CONTRACTS ¶ 1.6, at 18 (Rev. ed. 1993) ("A contract that is induced by fraud is 'voidable' by the injured party who has the power of avoidance."). The party asserting a rescission claim under New York law must plead and ultimately prove (a) a lawful right to rescind, (b) prompt notice of an intention to rescind, and (c) the restoration of the status quo. See <u>Cox v. Stokes</u>, 156 N.Y. 491, 51 N.E. 316, 320-21 (N.Y. 1898). To demonstrate a lawful right to rescind, the plaintiff must plead and prove fraud in the inducement of the contract, failure of consideration, an inability to perform the contract after it is made, or a breach of the contract that substantially defeats the purpose for which it was made. <u>New Paradigm Software Corp. v. New Era of Networks, Inc</u>., 107 F. Supp. 2d 325, 329 (S.D.N.Y. 2000). Because rescission is an equitable remedy, the party must also show that it lacks an adequate remedy at law. <u>Id</u>. A party having the right to rescind may instead elect to assert a claim for damages." <u>Empire State Bldg. Co., L.L.C. v. New York Skyline, Inc. (In re New York Skyline, Inc.)</u>, 432 B.R. 66, 75-76

An action for rescission of a contract based on fraud, unlike a cause of action for damages on the same ground, does not require that scienter either be pleaded or proved. Even an innocent misrepresentation is a sufficient ground for rescission. <u>Albany Motor Inn & Restaurant, Inc. v. Watkins</u>, 85 A.D.2d 797, 798 (3d Dep't 1981) (citing <u>Brodsky v. Nerud</u>, 68 AD2d 876). All that is required to state a cause of action for rescission of a contract based on fraud is to set forth the circumstances in detail showing that a false material representation was made and that plaintiff relied on the representation to his detriment. <u>Id</u>. While under New York law, fraud involves "a representation of fact, which is either untrue and known to be untrue or recklessly

made, and which is offered to deceive the other party and to induce them to act upon it, causing

injury," that is not the law that applies to rescind a contract based on fraud.  Fruchtman, 1991

U.S. Dist. LEXIS 15949, at *11 (3d Dep't 1981). To rescind a contract, for misrepresentation or

fraud, it is not necessary that Debtor knew it was false. Fruchtman v. First Edition Composite

Holdings, Inc., 1991 U.S. Dist. LEXIS 15949, *12 (S.D.N.Y. 1991) ("However, under New

York law, an action to rescind a contract "does not require that scienter either be pleaded or

proved." Albany Motor Inn and Restaurant, Inc. v. Watkins, 85 A.D.2d 797, 445 N.Y.S.2d 616,

617 (3d Dept. 1981); see also Seneca Wire & Mfg. Co. v. A.B. Leach & Co., 247 N.Y. 1, 159

N.E. 700, 702 (1928) ("It is not necessary, in order that a contract may be rescinded for fraud or

misrepresentation, that the party making the misrepresentation should have known that it was

false.").

Debtor tries to avoid summary judgment by claiming that Debtor is a legally distinct

entity from its sole shareholder Pelmadulla, but for the reasons set forth below, that claim is

baseless

### 1.    The Law Imputes Pelmadulla's Knowledge to the Debtor

The "sole actor rule" imputes, as a matter of law and without exception, the sole

shareholder's knowledge to the corporation. Bankruptcy Servs. v. Ernst & Young (In re CBI

Holding Co.), 529 F.3d 432, 453 (2d Cir. 2008).  Debtor states the sole actor rules does not apply

here and only applies where there is some sort of domination over the corporation. Pl's Mem., at

¶¶42-46. But Debtor confuses the issues pertaining to piercing the corporate veil and imputing

the sold shareholder's knowledge to the corporation. A sole shareholder's knowledge is

imputable to the corporation, whether there is self-dealing or dominion or not. Bankruptcy Servs.

v. Ernst & Young (In re CBI Holding Co.), 529 F.3d 432, 453 (2d Cir. 2008) (Thus, the sole

actor rule applies "where the principal and agent are one and the same" or, in the corporate

context, where "the principal is a corporation and the agent is its sole shareholder.") Id. Trott v.

Platinum Mgmt. (NY) LLC (In re Platinum-Beechwood Litig.), 2019 U.S. Dist. LEXIS 104562,

*62 (S.D.N.Y. 2019) (holding that the knowledge of the sole shareholder is imputed to the

corporation even where there was no allegation that it "exercised complete dominion over the

corporation") (citing Baker v. Latham Sparrowbush Assocs., 72 F.3d 246, 255 (2d Cir. 1995)

("The knowledge of a director, officer, sole shareholder or controlling person of a corporation is

imputable to that corporation.").  Some cases refer to it as the sole actor rule, which Debtor is

right often arises in cases where it is an exception to the adverse interest exception. That does not

make the sole rule any less applicable here; it merely means it often arises in a certain context.

Many cases apply the rule outside of the adverse interest exception and just state it as the legal

principle that the sole shareholder's knowledge is attributable to the corporation.  All cases

recognize the proposition, which is longstanding and indisputable.

It is just untrue, as Debtor states, that the knowledge of the sole shareholder is attributed

to the company "in this Circuit only where an individual malefactor is the sole shareholder or the

person who exercises complete, unfettered control over the entity."  Pl's Mem., at 19, ¶ 45.  Iin

what must have been a mistake, Debtor cited a case and provided a parenthetical that directly

contradicts its position.  At paragraph 45, page 2 of Debtor's Memorandum, Debtor provided the

following citation:

> See Breeden v. Kirkpatrick & Lockhart, LLP, 268 B.R. 704, 709
> (S.D.N.Y. 2001), aff'd sub nom. In re Bennett Funding Grp., Inc.,
> 336 F.3d 94 (2d Cir. 2003) ("The sole actor rule applies

34

> where the corporate principal and its agent are indistinguishable,
> such as where the agent is a corporation's sole shareholder, or
> where the corporation bestows upon its agent unfettered control
> and allows the agent to operate without meaningful supervision
> with respect to a particular type of transaction.").

Debtor's S.J Mem., at 19, ¶45.  Clearly, as Debtor's parenthetical demonstrates, the sole actor

rule applies where the agent is the sole shareholder or where the agent has unfettered control.

Accordingly, Debtor's own case supports 29 Beekman's position.

Debtor argues that the knowledge of its sole shareholder Pelmadulla should not be

imputed to Debtor because Pelmadulla does not "manage the day-to-day activities of the Debtor

and is not an 'agent' of the debtor." Id. at 19, ¶46. Debtor cites no law in its brief to support this

factual irrelevancy.  As set forth above, it is sufficient that Pelmadulla is the sole shareholder of

Debtor – no case holds otherwise, which is why Debtor has cited none. Id.

### 2. The Facts and Pure Principle of Agency Show that Debtor is Acting for Pelmadulla

At the moment Pelmadulla filed its claim on December 31, 2019, Debtor was in breach of

multiple provisions and representations in the Contract that stated that the proceeds of the sale

would be sufficient to satisfy "all claims." Serbagi Decl., Ex. 2, §§ 13b, 51b. The Proof of Claim

(which lists the loans Pelmadulla made to Debtor at Exhibit A to the Proof of Claim) states in an

accompanying Ato Prood of Claim, that the claim arises from loans that Pellmadulla made to

Debtor, which loans **Debtor agreed to pay back.** Id. at Ex. 8.  It states:

> Upon information and belief, over the years, Claimant agreed to loan certain funds to the
> Debtor in order for the Debtor to meet operating expense obligations, and the Debtor
> **covenanted and agreed to make periodic payments in amounts sufficient to pay the
> principal, interest and other charges, costs and expenses associated with the
> borrowed funds as and when due (the "Loan Agreement")**

Id. at ¶6.  The Addendum also states: (1) "The Foundation was formed and incorporated in

1979" ¶¶ 1-2; (2) The Foundation is the sole shareholder of the Debtor. ¶ 3; (3) The Debtor was

formed on behalf of the Foundation for purposes of managing certain assets belonging to

Princess Achraf." ¶ 4.

Moreover, on October 8, 2019 - Mr. Golsorkhi, President and Managing Agent for

Debtor, states by his bankruptcy filing Affidavit, Id. at Ex. 3:

(1) "I am sole managing director and president of Wansdown Properties Corporation N.V.

(the "Debtor") and am fully familiar with the facts set forth herein. All facts set forth in

this affidavit are based upon my personal knowledge of the Debtor's business and related

financial information gathered from my review of the Debtor's books and records." Id. at

¶1; (2) "I was named as a managing director of the Debtor in 1979.' ¶3; ("The Debtor's

primary asset is a seven-story townhouse located at 29 Beekman Place, New York, New

York (the "Town House")." ¶ 4; . . . (5) "As of the filing of the Debtor's bankruptcy

petition (the "Petition Date"), the debtor's primary asset is a seven-story townhouse

located at 29 Beekman Place, New York, NY (the "Town House")" ¶5;  Serbagi Decl., at

Ex. 3.

Debtor repeatedly represented as a material part of the Contract that the proceeds of the

sale under the Contract would be sufficient to satisfy "all claims." Serbagi Decl., Ex. 2, at §§13b,

51b. The representation had to be true at the time of closing.  Id. at §8b.  It was not.  Debtor was

entitled to and did argue that Debtor breached, and it was entitled to rescind on that basis.  see

e.g. Id. at Exs. 12, 15.  29 Beekman gave Debtor multiple opportunities to cure, but Debtor

boldly refused.  see.e.g. Id. at Exs. 12, 15, 22.

36

For all the foregoing reasons, Debtor withheld critical and material information about Pelmadulla. The information was so material to 29 Beekman that it asked for Debtor to represent in the Contract that the proceeds of the sale under the Contract would be sufficient to satisfy "all claims" and the Contract contains that provision. Akabas Decl., at ¶¶7-8.  Serbagi Decl., Ex. 2, at §§13b, 51b. Why Debtor would have misled 29 Beekman and whether it intended to do so is legally irrelevant. By letter dated January 15, 2020, 29, Beekman called Debtor's failure to disclose the Pelmadulla Claim as a breach of the Contract.  Serbagi Decl., Ex. 12.  In good faith and to try to make the deal work, 29 Beekman never waived its rights in that regard. The Contract expressly provides in Section 25(b): "Neither this contract nor any provision thereof may be waived, changed or cancelled except in writing."  Ex. 2, §25b.

## XI.    THE COURT SHOULD GRANT 29 BEEKMAN'S CROSS-MOTION FOR SUMMARY JUDGMENT

### A.  The Court Should Grant 29 Beekman's Cross-Motion for Summary Judgment for all the Reasons Set forth herein

The Court was correct that the resolution of certain issues should dispose of the case, and, in that sense, summary judgment is appropriate now.  For example, if the Court decides that the Contract language means that 29 Beekman had no obligation to close until forty-five days after the Confirmation Order, that is the end of Debtor's attempt to retain 29 Beekman's down payment.  If the Court finds that Debtor did not meet the conditions of closing, that is also the end of Debtor's case.  If the Court finds that Debtor itself by its February 18, 2020 letter repudiated by cancelling the contract before it was entitled, Debtor's case is over.  If the Court finds that Debtor breached because its 2011 tax return expressly states that Pelmadulla loaned Debtor $10,816,579 but it told Debtor in the Contract that the purchase price would be sufficient to satisfy all claims and this Court that no loan existed.  If the Court finds that 29 Beekman did

not breach because Debtor failed to send a proper time is of the essence letter after the date set for closing, Debtor's case is over.  There are multiple reasons set forth herein why 29 Beekman is entitled to its down payment back. But no matter how the Court rules, 29 Beekman's case is still alive because it has claims that are not appropriate for summary judgment now and which it does not waive by not raising now, like claims for fraud and breach of good faith and fair dealing, for which 29 Beekman would want discovery and is entitled to discovery.  In fact, Debtor's counsel expressly asked 29 Beekman that the present motions address only Debtor's claims, and 29 Beekman agreed, which agreement is memorialized in the Court's scheduling Order.  Serbagi Decl., Ex. 23.

29 Beekman is nonetheless entitled to summary judgment on Debtor's claims for all the reasons set forth in this memorandum and incorporates those arguments herein.  By way of summary:

First, no matter what the lawyers say, all the actual parties and their business representative agree that 29 Beekman did not breach the Contract because it did not have to close until 45 days after the Confirmation Order, i.e. March 1, 2020.  See supra, at Section I herein.  29 Beekman's position is supported by the testimony of two experts in the field of real estate transactions, with a combined 45 years working in negotiating and drafting real estate contracts. See Handwerker and Suslensky Expert reports. For these reasons alone, there was no breach by 29 Beekman.  29 Beekman is entitled to judgment as a matter of law and the return of its down payment deposit.

Second, there is no factual dispute that Debtor did not meet the contractual conditions of closing.  See supra, at Section IV.  One of those conditions was, in effect, that there be no claims at time of closing that would make the total of claims too great for Debtor to pay "all claims"

(without qualification) out of the proceeds of the sale.  Id.  There was the Pelmadulla claim, which made that condition unsatisfied, and it still is unsatisfied today.  Id.  The Court should grant Summary judgment for 29 Beekman on this issue alone.

Third, there is no dispute that the Contract does not contain a time is of the essence provision and no dispute that Debtor did not send a time is of the essence letter after February 10, 2020, as it had to do to claim breach (under its false reading of the Contract).  See supra, at Section III.  Taking everything Debtor states as true, Debtor itself repudiated by its February 18, 2020 letter without sending a time is of the essence letter.  Serbagi Decl., Ex. 1. The Contract called for liquidated damages only upon 29 Beekman's **breach** (Serbagi Decl., Ex.2, at §20), not for failure to meet a closing date, especially a closing date not supported by the Contract language.  The Contract states: "If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages."  Id. (emphasis added.)

Putting aside all the many other reasons 29 Beekman was not required to close on February 10, 2020, failing to meet a closing date is not a breach as a matter of law because (i) there was no time is of the essence provision in the Contract, and (ii) Debtor never sent a timely time is of the essence letter after the date it claims (wrongly) 29 Beekman should have closed.

### B.  The Court Should Grant 29 Beekman's Motion for Summary Judgment Because Debtor Breached a Material Representation in the Contract

New York law on recission is set forth in Section X.  There is no question that Debtor represented in the Contract, and otherwise to 29 Beekman over and over, that the proceeds of the purchase price would be sufficient to satisfy all claims.  Serbagi Decl., Ex. 2, at §§13b, 51b. There is also no question that this was at all relevant times untrue.  Id. at Ex. 8. On this ground alone, whether it was known by Debtor or not, whether Defendant intended this or not, there is a

breach that entitled 29 Beekman to rescind. In every key letter and email, 29 Beekman always

reserved its rights, and Debtor never cured.

## **CONCLUSION**

For all the foregoing reasons, 29 Beekman has not breached the Contract and Debtor is

not entitled to 29 Beekman's down payment.

Dated:  New York, New York
      May 7, 2020

                  By: /Christopher Serbagi/
                    The Serbagi Law Firm
                    Attorneys for 29 Beekman Corp
                    488 Madison Avenue, Suite 1120
                    New York, New York 10022
                    Tele: (212) 308-8505