UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

In re:                                              :
                                                    :
WANSDOWN PROPERTIES CORPORATION    :
N.V.,                                               :
                                                    :        Chapter 11
                                                    :        Case No. 19-13223 (SMB)
                    Debtor.                          :
-------------------------------------------------------X
                                                    :
WANSDOWN PROPERTIES CORPORATION    :
N.V.,                                               :
                                                    :
                    Plaintiff,                      :
                                                    :
            - against -                             :
                                                    :        Adv. Pro. No. 20-01056 (SMB)
29 BEEKMAN CORP.,                                   :
                                                    :
                    Defendant.                       :
-------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT

**A P P E A R A N C E S :**

BLANK ROME LLP
1271 Avenue of the Americas
New York, New York 10020

            Ira L. Herman, Esq.
            Evan J. Zucker, Esq.
                Of Counsel

*Special Litigation Counsel for Plaintiff*

THE SERBAGI LAW FIRM
488 Madison Avenue, Suite 1120
New York, New York 10022

            Christopher Serbagi, Esq.
                Of Counsel

*Attorney for Defendant*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

This is a case of buyer's remorse.  The defendant 29 Beekman Corp. ("Beekman"

or "Purchaser") agreed to buy real property owned by the debtor Wansdown Properties

Corporation N.V ("Debtor" or "Seller").   Beekman backed out of the contract, and this

adversary proceeding involves the right to the down payment.  Both parties have moved

for summary judgment.  (*See Debtor's Memorandum of Law in Support of Motion for*

*Summary Judgment and in Opposition to Defendant's Motion to Dismiss Complaint*

("*Debtor's Motion*"), ECF Doc. # 12)[1]; *29 Beekman's Memorandum of Law in*

*Opposition to Debtor's Motion for Summary Judgment and in Support of 29*

*Beekman's Cross-Motion for Summary Judgment* ("*Beekman Motion*"), ECF Doc. #

28.)  For the reasons that follow, both motions are denied because whether the Debtor

was ready, willing and able to close following Beekman's breach presents a disputed

issue of material fact.

## BACKGROUND

### A.    Purchase Agreement

The Debtor was formed under the laws of Curacao in 1979 as a holding company

to own and manage a townhouse located at 29 Beekman Place, New York, New York

10022 (the "Townhouse") for Princess Achraf Pahlavi, the sister of the Shah of Iran.  The

Townhouse is the Debtor's main asset.  On September 25, 2019, the Debtor entered into

a Residential Contract of Sale ("Purchase Agreement") to sell the Townhouse to

---

[1]     Unless otherwise specified, references to docket entries are to documents filed on the electronic docket of *Wansdown Properties Corporation, N.V. v. 29 Beekman Corp.* (Adv. Pro. No. 20-01056). References to the docket entries in the main bankruptcy case are denoted as "Main Case ECF."

2

Beekman for $10,300,000.  (*Declaration of Ira L. Herman in Support of Plaintiff's Motion for Summary Judgment* ("*Herman Decl.*"), Ex. A (EFC Doc. # 14.).)  Beekman delivered a down payment of $1,030,000 ("Downpayment") to be held in escrow "until Closing or sooner termination of this contract." (Purchase Agreement ¶¶ 3-4.)

The sale could occur in one of three ways.  The Purchase Agreement contemplated that the Debtor would file a chapter 11 case, and the "consummation of the transactions contemplated herein is subject to Seller's receipt of requisite authority under the Bankruptcy Code pursuant to, among other things, the entry of an order confirming the Plan, *or if not possible, then approving a 363 Sale.*" (Purchase Agreement ¶ 51(a) (emphasis added).)[2]  The parties also agreed that the Purchase Agreement was still binding even in the absence of any bankruptcy proceeding.  (*See* Purchase Agreement ¶ 51(a) ("[I]f Seller does not file such [chapter 11] proceeding or it is dismissed for any reason, then this Contract shall remain a binding obligation of Seller to sell and Purchaser to buy the Premises as set forth herein apart from the contemplated Bankruptcy Court proceeding.").)

A sale under § 363 (or outside of a bankruptcy case) rather than under a confirmed plan would have a significant financial impact on Beekman.  New York State imposes a so-called "Mansion Tax" on conveyances of certain real estate such as the Townhouse.  Based on the $10,300,000 sale price, the Mansion Tax would total $334,750.  *See* N.Y. TAX LAW § 1402-b(a)(4).  The Mansion Tax is similar to a stamp tax

---

[2]     The order, whether confirming the plan or approving the sale under § 363, was defined as the "Confirmation Order."  (Purchase Agreement ¶ 51(a).)

within the meaning of 11 U.S.C. § 1146(a) (formerly § 1146(c)), *see In re Jacoby–Bender, Inc.*, 40 B.R. 10, 13 (Bankr. E.D.N.Y. 1984) (discussing N.Y. TAX LAW § 1402), *aff'd*, 758 F.2d 840 (2d Cir. 1985), and is not imposed in connection with a transfer under a confirmed plan.  11 U.S.C. § 1146(a).

Beekman agreed that it would be responsible for paying any Mansion Tax. (Purchase Agreement ¶ 40.)  Thus, if the sale was consummated under a plan, Beekman would not have to pay it.  If, on the other hand, the sale was consummated pursuant to section 363 before a plan was confirmed, the exemption under Bankruptcy Code § 1146(a) would not apply.  *See Florida Department of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 52-53 (2008).  And obviously, the section 1146(a) exemption would not apply if the transfer occurred when no bankruptcy case was pending.

Important to the present dispute, the Debtor represented that "the net proceeds of a sale under this Contract would be sufficient to satisfy all claims against Seller and, as reasonably projected, Seller's contemplated estate in bankruptcy."  (Purchase Agreement ¶ 51(b).)  Beekman's obligation to purchase the Townhouse was subject to the fulfillment of several conditions precedent, including the "accuracy, as of the date of Closing, of the representation and warranties of Seller made in this contract."  (Purchase Agreement ¶ 13 (a)(i).)[3]

---

[3]    In the event that representations related to the conditions precedent to Closing were not satisfied, either party could adjourn the Closing at the Seller's or Purchaser's option for a reasonable period for the Seller to remedy the defect or reduce the purchase price by the reasonable cost of remedying the defect. (Purchase Agreement ¶ 33.)  Neither party exercised this right.

4

The Closing Date was set to take place no later than forty-five days after the Confirmation Order became final and non-appealable, "provided, however, that in no event shall the Closing take place later than January 31, 2020, subject to extension of the Final Date."  (Purchase Agreement ¶¶ 51(e), 52(d).)  Beekman could, in this regard, extend the Final Date "on one or more occasions, until the earlier of 30 days after the entry of the Confirmation Order or January 31, 2021 by notice to Seller prior to the passing of the then effective Final Date."  (Purchase Agreement ¶ 52(d).)

Finally, the Purchase Agreement contained an integration clause:

All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

(Purchase Agreement ¶ 25.)

## B.    Bankruptcy

The Debtor commenced this chapter 11 case on October 8, 2019 and filed its modified plan ("Plan") and modified disclosure statement ("Disclosure Statement") on December 9, 2019.  The Plan contemplated that the Debtor would sell the Townhouse to Beekman and the sale proceeds would be sufficient to pay all creditors except Gholam Reza Golsorkhi, the managing director and president of the Debtor, who had agreed to subordinate his asserted general unsecured claim in the approximate amount of $7.5 million to the payment of all other creditors.  On December 12, 2019, the Court preliminarily approved the Disclosure Statement and scheduled the hearing on the final approval of the Disclosure Statement and confirmation of the Plan for January 14, 2020. (*Order (I) Preliminarily Approving Disclosure Statement, and (II) Scheduling Hearing*

*on Final Approval of Disclosure Statement and Confirmation of Debtor's Chapter 11 Plan*, dated Dec. 12, 2019 (Main Case ECF Doc. # 32).)  The schedule would allow the Debtor to obtain a final, non-appealable order confirming the Plan by the January 31, 2020 deadline.  *See* FED. R. BANKR. P. 8002(a) (requiring a notice of appeal to be filed within fourteen days of the order appealed from).

The Debtor soon hit a snag.  On December 31, 2019, the Debtor's sole shareholder, Pelmadulla Stiftung Vaduz ("Pelmadulla"), filed a general unsecured proof of claim in the sum of $3,243,941.19 based on a purported loan to the Debtor ("Pelmadulla Claim").  (*Declaration of Christopher Serbagi in Opposition to Wansdown's Motion for Summary Judgment and in Support of 29 Beekman's Cross-Motion for Summary Judgment* ("*Serbagi Decl.*"), dated Dec. 31, 2019, Ex. 8 (EFC Doc. # 23).)  As a result, the Debtor could not confirm the 100% Plan that it had filed because, although it disputed the Pelmadulla Claim, the sale to Beekman would not generate sufficient proceeds to reserve for the Pelmadulla Claim.  Consequently, the Debtor switched gears and determined to consummate the transaction with Beekman through a section 363 sale instead of under a confirmed plan.

The Debtor filed a sale motion on January 7, 2020, (*see Motion Pursuant to 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002 and 6004 for an Order Approving the Sale of the Debtor's Real Property*, dated Jan. 7, 2020 ("Sale Motion") (Main Case ECF Doc. # 38)), and the Court scheduled the sale hearing for January 14, 2020.  (*See Order Shortening Notice on Debtor's Motion Pursuant to 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002 and 6004 for an Order Approving the Sale of the Debtor's Real Property*, dated Jan. 7, 2020 (Main Case ECF Doc. # 40).)  The Court expedited the sale

6

hearing to allow the Debtor to meet the contractual requirement of a final, non-appealable sale order by January 31, 2020.

The hearing on the Sale Motion went forward on January 14. The Court noted at the hearing that it would not be possible for the Debtor to solicit votes on a revised plan, which it had not yet filed, by the January 31, 2020 Closing deadline. (*Herman Decl.*, Ex. B, at 19:20-20:2.)[4] At the hearing, Beekman's attorney referred to Beekman's objection (none had been filed), but informed the Court that the parties had reached a tentative settlement in which case Beekman would waive its objection. (*Id.* at 9:21-10:4; 18:7-10.) The sale hearing was adjourned to January 16, 2020 to allow the Debtor to deal with Beekman's and certain other objections to the sale.

On January 15, 2020, Beekman sent a letter ("January 15 Letter") to the Debtor that requires some parsing. (*Herman Decl.*, Ex. C.) The tentative settlement referred to the previous day and described in the letter had fallen through. Beekman first characterized the Debtor's temporal problem as rendering compliance with the January 31 deadline "not convenient or not desirable" for the Debtor, but "not impossible." (January 15 Letter at 2-3.) The January 15 Letter then referred to the Debtor's concession that "a plan is still possible through its express request for a 45-day extension of the January 31, 2020 deadline," (*id.* at 2), as proof that a confirmed plan

---

[4]     The Debtor would have had to file a revised plan and disclosure statement and the hearing to approve the disclosure statement required a twenty-eight-day notice period. FED. R. BANKR. P. 3017(a). Assuming the Court approved the disclosure statement, *see* 11 U.S.C. § 1125(b), it would then fix (i) a period within which the Debtor had to transmit the approved disclosure statement and the plan to the creditors, (ii) the time within which they could vote to accept or reject the plan and (iii) the date for the confirmation hearing. FED. R. BANKR. P. 3017(d). For the order confirming such a plan to be final and non-appealable by January 31, 2020, it would have had to be entered by January 16, 2020, or within two days of the January 14 hearing.

was still possible.  This was disingenuous.  The issue was not whether it was "still possible" to confirm a revised plan.  The issue was whether it was possible to obtain a final order confirming a plan by January 31, 2020.  It was not, and besides, Beekman refused the forty-five-day extension.

Consequently, the Debtor's only alternative was to sell under section 363 by January 16, 2020, and thereby procure a final non-appealable Confirmation Order under the Purchase Agreement by January 31, 2020 but Beekman was only willing to do so if the Debtor assumed the obligation to pay the Mansion Tax which the Debtor apparently refused to do.

The January 15 Letter then went on to change the deal.  It refused to close under a section 363 sale and intended to terminate the Purchase Agreement if an order confirming a bankruptcy plan was not final and non-appealable by January 31, 2020:

> So, although the buyer is not willing to extend the January 31, 2020 deadline, the buyer will elect to terminate the contract of sale if a bankruptcy plan is not final and non-appealable in time for a closing to occur by the current deadline, January 31, 2020.  Buyer will await that outcome, but is withdrawing from any further voluntary participation in a pre-plan 363 sale.

Despite what appeared to be an anticipatory repudiation of Beekman's obligation to close under an order approving a section 363 sale because a final confirmation order by January 31 was no longer "possible," the Debtor elected to press forward with the sale.  The Court conducted an evidentiary hearing on the Sale Motion on January 16, 2020 and entered an order approving the sale that same day.  (*Serbagi Decl.*, Ex. 6 ("Sale Order").)  Beekman was present through counsel, Seth Akabas, Esq., at the Sale Hearing.  He requested a moment to confer with all counsel and declined the invitation

8

to cross-examine Golsorkhi, the Debtor's only witness. (*Herman Decl.*, Ex. G, at 41:8-42:10.) The Court took a brief recess though what it concerned or accomplished is uncertain. Nevertheless, Beekman never objected to the assumption of the Purchase Agreement or the proposed sale.

The Sale Order signed the same day approved the terms and conditions of the Purchase Agreement, authorized the Debtor to assume the Purchase Agreement, concluded that the sale was negotiated by the Debtor and Beekman at arm's length, without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code. (Sale Order ¶ C.) The Court retained "exclusive jurisdiction to interpret, implement, and enforce the terms and provisions of, and to resolve any and all disputes that may arise under or in connection with, this Order and the Purchase Agreement." (Sale Order ¶ 12.) The Sale Order became final and non-appealable on January 30, 2020, and hence, met the January 31, 2020 deadline.

On January 23, 2020, the Debtor sent notice to Beekman scheduling the closing for January 31, 2020 and representing that the Debtor was ready, willing and able to close on that date. (*Herman Decl.*, Ex. I.) In response, Beekman notified the Debtor via email that it was exercising its right pursuant to Paragraph 52(d) of the Purchase Agreement to extend the Final Date to February 10, 2020.[5] (*Herman Decl.*, Ex. Q.) On January 31, 2020, the Debtor scheduled the closing for February 10, 2020 at 10:00 a.m. ("Adjourned Final Date") at the offices of the Debtor's counsel and advised Beekman

---

[5]    Beekman could adjourn the Closing Date for up to thirty days after the January 16, 2020 Sale Order. (*See* Purchase Agreement ¶ 52(d).) The thirtieth day fell on Saturday, February 15, 2020, and the following Monday was Presidents' Day. Hence, the Closing Date could be extended by Beekman to February 18 but not later without the Debtor's consent.

that time was of the essence with respect to the Adjourned Final Date.[6]  (*Herman Decl.*,

Exhibit R ("Time of the Essence Letter").)

The deal never closed.  On the Adjourned Final Date, Beekman advised the

Debtor that it was exercising its right pursuant to Paragraph 52(d) of the Purchase

Agreement to extend the closing to March 10, 2020.  This date, however, fell beyond the

Final Date permitted under the express terms of the Purchase Agreement.  (*See Herman*

*Decl.*, Ex. U.)  On February 18, 2020, the Debtor notified Beekman it was terminating

the Purchase Agreement based on Beekman's failure to close by the Adjourned Final

Date and intended to retain the Downpayment as liquidated damages.  (*Serbagi Decl.*,

Ex. 1.)  The Debtor eventually sold the Townhouse for $11,500,000 to another buyer

under a revised plan.  (*See Disclosure Statement for Second Amended Chapter 11 Plan*

*of Wansdown Properties Corporation N.V.*, dated June 9, 2020, at ¶ E (Main Case ECF

Doc. # 114); *Order Granting Final Approval of Disclosure Statement and Confirming*

*the Debtor's Second Amended Chapter 11 Plan*, dated July 16, 2020, at ¶ 27 (Main Case

ECF Doc. # 130).)

## B.     This Adversary Proceeding

The Debtor commenced this adversary proceeding on February 26, 2020

asserting claims for breach of contract based on Beekman's failure to close by February

15, 2020 and sought a declaratory judgment stating that (i) the Debtor is entitled to

retain the Downpayment as liquidated damages, (ii) the Downpayment is property of

the Debtor's estate pursuant to section 541 of the Bankruptcy Code, and (iii) Beekman's

---

[6]     The Debtor also stated time was of the essence in a similar letter to Beekman dated January 30,
2020 in which it acknowledged receipt of Beekman's extension of the Final Date.  (*Serbagi Decl.*, Exhibit
7.)

rights title, and interest in and to the Downpayment had been extinguished and

terminated. (*Complaint*, dated Feb. 26, 2020, ¶¶ 79-96 (ECF Doc. # 1).) Beekman filed

its own adversary proceeding to recover the down payment. (*See Complaint*, dated Mar.

23, 2020 (ECF Doc. # 1) and *Amended Complaint*, dated Apr. 23, 2020 (ECF Doc. #3),

both filed in Adv Pro. No. 20-01063 (SMB).) That adversary proceeding and this

adversary proceeding were consolidated pursuant to the *Order Consolidating

Adversary Proceedings for Procedural Purposes and Fixing Briefing Scheduling*, dated

May 1, 2020 (Adv. Pro. No. 20-01063 (ECF Doc # 4).)

The parties subsequently filed cross-motions for summary judgment. The

*Debtor's Motion* asserts that Beekman breached the Purchase Agreement by failing to

close by the Adjourned Final Date. (*Debtor's Motion* ¶¶ 18-22.) The Debtor also alleges

that Beekman anticipatorily breached the Purchase Agreement on January 15, 2o20 by

stating it would terminate the Purchase Agreement if the order confirming a bankruptcy

plan was not final and non-appealable by January 31, 2020. (*Id.* ¶¶ 14-17.)

Beekman opposed the *Debtor's Motion* and cross-moved for summary judgment,

arguing that it was not required to close by the Adjourned Final Date, and instead, had

until March 1, 2020 – forty-five days after entry of the Sale Order – to perform.

(*Beekman Motion* at 2-11.) It also disputed that it anticipatorily breached the Purchase

Agreement because it did not refuse to perform its obligations under the Purchase

Agreement and the Debtor is foreclosed from making the argument because it treated

the Purchase Agreement as a valid contract after the alleged repudiation. (*Id.* at 19-25.)

Moreover, even if it had breached the Purchase Agreement, its non-performance is

excused by the Debtor's failure to show it was ready, willing and able to close. (*Id.*, at

15-17.)  Finally, the Purchase Agreement was induced by fraud because the Debtor failed to disclose the Pelmadulla Claim. (*Id.*, at 31-37.)

## DISCUSSION

### A.    Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b), the *Amended Standing Order of Reference*, No. M 10-468, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012) and paragraph 12 of the Sale Order.

This is a core proceeding.  Although the Purchase Agreement is a pre-petition contract, the Court authorized the assumption of Purchase Agreement through the Sale Order, and the adversary proceeding implicates the interpretation and enforcement of the Sale Order, a proceeding over which this Court retained exclusive jurisdiction.

The Court has the authority to enter a final judgment on all claims.  In accordance with Rule 7008 of the Federal Rules of Bankruptcy Procedure, the Debtor expressly consented to the Court's authority to enter a final judgment in paragraph 11 of its original *Complaint*, dated Feb. 26, 2020 (ECF Doc. # 1).  Beekman did not file an answer or state whether it did or did not consent to the entry of a final judgment as required by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.  In its own adversary proceeding, Beekman alleged that the Court had authority to enter a final judgment but did not expressly include the allegation required by Federal Bankruptcy Rule 7008.  *See Complaint*, dated Mar. 23, 2020, at ¶ 11 (Adv Pro. No. 20-01063 (SMB) ECF Doc. # 1) and *Amended Complaint*, dated Apr. 23, 2020, at ¶ 8 (Adv Pro. No. 20-01063 (SMB) ECF Doc. #3).)

Despite its failure to make the express allegation required by Federal Bankruptcy Rules 7008 and 7012(b), Beekman was made aware of the opportunity to withhold its consent to the Court's authority to enter a final judgment by virtue of the allegation in the Debtor's complaint.  In addition, Beekman engaged in substantial litigation before the Court relating to the merits of the Debtors' claims, including its motion to dismiss and its cross-motion for summary judgment, without objecting to the Court's authority. Accordingly, it impliedly consented to the Court's authority to enter a final judgment. *See LaMonica v. Harrah's Atlantic City Operating Co., LLC* (*In re JVJ Pharmacy, Inc.*), Adv. Pro. No. 18-01853 (SMB), 2020 WL 4251666, at \*5 (Bankr. S.D.N.Y. July 24, 2020).

## B.    Summary Judgment Standards

Although the Purchase Agreement does not include a governing law provision, it concerns the sale of real property in New York and is governed by New York law.  *See Riley v. Rivers*, No. 15-CV-5022 (DLI), 2016 WL 11263672, at \*5 (E.D.N.Y. Sept. 19, 2016) ("For claims that are wholly concerned with title to real property, New York's choice of law rules apply the law of the state where the property is located." (internal citation and quotation marks omitted)), *aff'd*, 710 F. App'x 503 (2d Cir. 2018); *Madison Realty, Inc. v. Neiss*, 676 N.Y.S.2d 672, 673 (N.Y. App. Div. 1998) (Under New York choice of law principles, "contracts referring to the transfer of title to land are governed by the law of the place where the land is situated." (internal citation and quotation marks omitted)).  When asked to interpret contractual language, the question under New York law is "whether the contract is unambiguous with respect to the question disputed by the parties."  *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595

F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76, 83 (2d Cir. 2002)). Ambiguity presents a question of law. *Id.* A contract is ambiguous if it "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Int'l Multifoods*, 309 F.3d at 83 (internal quotation marks and citation omitted); *accord Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010); *Maverick Tube*, 595 F.3d at 466. An agreement is not ambiguous if it has a definite and precise meaning, and unambiguous language does not become ambiguous because a party urges a different interpretation that strains the language beyond its ordinary meaning. *Maverick Tube*, 595 F.3d at 467; *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). Where the dispute concerns a provision of the contract, the Court must consider the contract "as a whole to ensure that undue emphasis is not placed upon particular words and phrases," *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007); *accord Maverick Tube*, 595 F.3d at 468, and "seek to give '[e]ffect and meaning . . . to every term of [a] contract.'" *XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*, 874 F. Supp. 2d 263, 284 (S.D.N.Y. 2012) (quoting *Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d 555, 557 (N.Y. App. Div. 1996)). If the contract is ambiguous, "'the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'" *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275-76 (2d Cir. 2000) (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir. 1998)).

14

## B.      The Deadline to Close

I conclude that the Purchase Agreement is not ambiguous with respect to the deadline by which the parties were obligated to close. The Purchase Agreement provided that the Closing shall take place no later than forty-five days after the Confirmation Order, a term that included the Sale Order, but "in no event shall the Closing take place later than January 31, 2020, subject to extension of the Final Date." (Purchase Agreement ¶ 51(e).)  The Purchaser could extend the Final Date up to the *earlier of* thirty days after the Confirmation Order or January 31, 2021.  The Sale Order was entered on January 16, 2020, the last day to appeal was January 30, 2020, and hence, the Sale Order was final and non-appealable  on January 31, 2020.  Read together, these provisions required the parties to close by January 31, 2020, unless Beekman extended the Final Date up to thirty days after January 16, 2020.  As stated, because of weekend and holidays, Beekman could extend the Final Date up to February 18, 2020 and, in fact, exercised its option to extend the Closing Date to February 10, 2020.[7]

Despite the unambiguous language of the Purchase Agreement, Beekman argues through the offer of extrinsic evidence that the parties intended for the Purchase Agreement to close forty-five days after the entry of the Confirmation Order.  Seth

---

[7]      Beekman's counsel appears to argue that the closing by January 31, 2020 was a condition to Beekman's obligation to purchase under paragraph 52(d) and because the Closing did not occur by that date, it was relieved of that obligation.  (*See Declaration of Seth Akabas* ("*Akabas Decl.*"), dated May 7, 2020, at ¶¶ 22, 28(d), (g) (ECF Doc. # 24).)  This interpretation ignores the language that permitted Beekman to extend the Closing Date up to thirty days after the entry of the Sale Order and *obligated* the parties to close by the extended, Final Date.  (Purchased Agreement ¶ 51(e).)  In addition, having exercised the option to extend the Closing Date beyond January 31, Beekman cannot argue that it was relieved of its obligation to purchase based on the failure to close by January 31, 2020.  *See M. O'Neil Supply Co. v. Petroleum Heat & Power Co.*, 19 N.E.2d 676, 679 (N.Y. 1939).

Akabas, Beekman's lawyer who negotiated the Purchase Agreement on its behalf, recounted the negotiations leading up to the Purchase Agreement and the discussions that Beekman needed and insisted on forty-five days to close after the entry of the Confirmation Order because it did not want to tie up $10 million while the Debtor obtained the necessary Court approvals.  (*Akabas Decl.* ¶¶ 3, 14.)  In addition, Beekman submitted reports by two "experts" who did not participate in the negotiations but nonetheless opined that the parties *intended* to have up to forty-five days after the Confirmation Order to close because that is the custom and practice.  (*Expert Report of Alexander Suslensky*, dated May 5, 2020 ("*Suslensky Report*") ¶ 12 ("The primary purpose of providing for a 45-day period between the issuance of the Confirmation Order and closing date was to allow Purchaser adequate time to liquidate investments necessary to provide the balance of the purchase price of approximately ten million dollars.  No other interpretation of the Contract would explain the 45-day period included in the provision."); ¶ 16 ("For the reasons set forth above, I believe that the intent of the pertinent provision of the Contract was to allow purchaser up to forty-five days after the entry of the Confirmation Order to obtain necessary funds to close the transaction.")(ECF Doc. # 26);  *Expert Report of Stacie Handwerker*, dated May 5, 2020 ("*Handwerker Report*"), ¶ 17 ("[I]t makes the most sense that the only date by which the Purchaser would agree to be bound to close, and be in Default upon failure to close, is the date that is the specified number of days after the Bankruptcy Court approves the sale as evidence by the issuance of the Confirmation Order.  I have no doubt whatsoever that this is what was intended when the Purchaser's Rider was drafted and the only way the Contract would have made sense to the Purchaser to enter.") (ECF Doc. # 25).)

16

These declarations/reports ignore and contradict the plain language that specifically granted Beekman only thirty days after the Confirmation Order as the outside date by which the parties had to close if Beekman exercised its option to extend the Final Date.  Despite Akabas's and the experts' contrary statements, the parties obviously agreed that thirty days was sufficient time for Beekman to liquidate the funds it needed.  In fact, Beekman implied in its January 15 Letter that it was ready to close (that is, it had the cash) on January 31, 2020 because it stated it would close on that date pursuant to a final order confirming a plan.  Furthermore, Akabas' testimony regarding the negotiations leading up to the execution of the Purchase Agreement violates the parol evidence rule and ignores the integration clause.

Furthermore, the experts' opinions ignore a critical requirement of the Purchase Agreement and bankruptcy law.  Both opined that the Purchase Agreement must be read to permit a closing within forty-five days of the Confirmation Order; otherwise, it could require the parties to close before the Court entered a Confirmation Order. (*Suslensky Report* ¶ 12 ("To read it otherwise would mean that a party could be in default by January 31, 2020 if the Confirmation Order did not occur before then or occurred less than forty-five days prior to the January 31, 2020 date."); *Handwerker Report* ¶ 17 ("[I]n order to conclude that Purchaser had an affirmative obligation to close by the "Final Date" (which initially was January 31, 2020 as extended to February 10, 2020), then Seller's reading of the Contract means that, in the scenario in which Seller filed a bankruptcy proceeding, Purchaser would have been required to close on January 31, 2020 (or shortly thereafter) even if this date was prior to the entry of a Confirmation Order.")  These arguments ignore that bankruptcy law does not permit the

Debtor to transfer the Townhouse without Court approval, 11 U.S.C. § 363(b)(1), and the Purchase Agreement conditioned the obligation to close on a final and non-appealable Confirmation Order.  (Purchase Agreement ¶ 51(e); *see also* ¶ 51(a), (c).)  And where, as here, the entry of the Confirmation Order was delayed, Beekman still had the absolute right to extend the Closing Date to thirty (instead of forty-five) days after the entry of the Confirmation Order.

Finally, Beekman spills a great deal of ink arguing that the Debtor has made a judicial admission that it had forty-five days after the Confirmation Order to close and is, therefore, estopped from taking a contrary position.  (*Beekman Motion* at. 3-7.)  The Debtor submitted a declaration signed by Golsorkhi at the beginning of the case required by the Court's Local Bankruptcy Rule 1007-2, which mandates the disclosure of information about the Debtor, its business and its financial affairs.  Golsorkhi disclosed the then-pending sale to Beekman and stated, at paragraph 20, that "[t]he closing of the transactions contemplated in RSA are scheduled to take place no later than the fortyfive (45) days after the entry of an order confirming a chapter 11 plan.").)  According to Beekman, this statement was a judicial admission.

I disagree.  "A judicial admission is a statement made by a party or its counsel that has the effect of withdrawing a fact from contention and which binds the party making it throughout the course of the proceeding."  *Pillars v. General Motors LLC (In re Motors Liquidation Company)*, 957 F.3d 357, 360 (2d Cir. 2020).  A party's statement interpreting a contract cannot be a judicial admission because it constitutes a legal conclusion rather than a factual admission.  *See Int'l Cards Co., Ltd. v. MasterCard Int'l Inc.*, 2017 WL 1133425, at *5 (S.D.N.Y. Mar. 24, 2017) (party's

18

interpretation of a notice provision in a contract is "a legal argument rather than a factual statement" and therefore "is not a judicial admission that precludes [a party] from asserting the legally correct interpretation of the contract."), *aff'd*, 741 F. App'x 41 (2d Cir. 2018); *Meehancombs Glob. Credit Opportunities Master Fund, LP v. Caesars Entm't Corp.*, 162 F. Supp. 3d 200, 212 (S.D.N.Y. 2015) ("the statements are not judicial admissions because they concern the legal effect of certain transactions."). Golsorkhi's interpretation of the Purchase Agreement's Closing requirement does not, therefore, constitute a judicial admission and neither the Debtor nor the Court is bound by his interpretation of its terms.

## C.    Beekman's Breaches

### 1.    Anticipatory Repudiation

Beekman committed at least two breaches of the Purchase Agreement. The first was an anticipatory repudiation. An anticipatory repudiation occurs when a party to a contract (1) states that he cannot or will not perform his obligations, or (2) commits a voluntary affirmative act that renders the obligor unable or apparently unable to perform his obligations. *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.,* 705 N.E.2d 656, 659 (N.Y. 1998) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 250 (1981)); *see Lucente v. Int'l Bus. Mach. Corp.,* 310 F.3d 243, 258 (2d Cir.2002); *De Lorenzo v. Bac Agency, Inc.,* 681 N.Y.S.2d 846, 848 (N.Y. App. Div. 1998); JOHN D. CALAMARI & JOSEPH M. PERILLO, THE LAW OF CONTRACTS § 12–4, at 525 (3rd ed.1987); RESTATEMENT (SECOND) OF CONTRACTS § 250 cmt. a (1981). "For a statement to constitute an anticipatory breach, 'the announcement of an intention not to perform [must be] positive and unequivocal.'" *Argonaut P'ship, L.P. v. Sidek, S.A. de C.V.,* No. 96

19

Civ. 1967(MBM), 1996 WL 617335, at *5 (S.D.N.Y. Oct. 25, 1996) (quoting *Tenavision, Inc. v. Neuman,* 379 N.E.2d 1166, 1168 (N.Y. 1978)), *aff'd on grounds stated in district court op.,* 141 F.3d 1151 (2d Cir. 1998).  If an anticipatory repudiation occurs, the non-breaching party has two mutually exclusive options.  He may elect to treat the contract as terminated and exercise his remedies or he may continue to treat the contract as valid.  *Lucente,* 310 F.3d at 258; *ESPN, Inc. v. Office of the Comm'r of Baseball,* 76 F. Supp. 2d 383, 388 (S.D.N.Y.1999); *Strasbourger v. Leerburger,* 134 N.E. 834, 835 (N.Y. 1922); *Inter–Power of New York, Inc. v. Niagara Mohawk Power Corp.,* 686 N.Y.S.2d 911, 913 (N.Y. App. Div. 1999), *leave to appeal denied,* 717 N.E.2d 699 (N.Y. 1999). Ordinarily, anticipatory repudiation presents a question of fact but when the anticipatory repudiation is expressed in writing it may be decided as a question of law. *Best Payphones, Inc v. Manhattan Telecomms. Corp.* (*In re Best Payphones, Inc.*), 450 F. App'x 8, 11 (2d Cir. 2011) (summary order).

The January 15 Letter constituted an anticipatory repudiation.  It stated that Beekman would not close under a section 363 sale and intended to terminate the Purchase Agreement if an order confirming a bankruptcy plan was not final and non-appealable by January 31, 2020:

> So, although the buyer is not willing to extend the January 31, 2020 deadline, the buyer will elect to terminate the contract of sale if a bankruptcy plan is not final and non-appealable in time for a closing to occur by the current deadline, January 31, 2020. Buyer will await that outcome, but is withdrawing from any further voluntary participation in a pre-plan 363 sale.

For the reasons stated, a final order confirming a plan was no longer possible by the January 31, 2020, and the January 15 Letter imposed a deadline that was impossible to meet.  The Debtor had the contractual right to insist on a sale under section 363, and

Beekman's statement was an unambiguous and unequivocal repudiation of its

obligation to close pursuant to a section 363 sale order.

### 2.    The Failure to Close

Despite Beekman's repudiation, the Debtor exercised its right to ignore the

anticipatory breach and insist on compliance with the Purchase Agreement.  It went

forward with the sale hearing the next day and obtained the Sale Order.  Beekman

attended the Sale Hearing but did not object to the Debtor's motion or contend that it

was not obligated to close under a § 363 sale order.  On January 23, 2020, the Debtor

sent notice to Beekman scheduling the closing for January 31, 2020 and representing

that the Debtor was ready, willing and able to close on that date.  (*Herman Decl.*, Ex. I.)

After some back and forth between the parties, the Debtor advised Beekman on January

27th that its failure to close on January 31, 2020 would be deemed a material breach

entitling the Debtor to keep the down payment and asked Beekman to state whether it

would close on January 31.  (*Herman Decl.*, Ex. K.)  In response, Beekman notified the

Debtor via email on January 29, 2020 that it was exercising its right pursuant to

Paragraph 52(d) of the Purchase Agreement to extend the Final Date to February 10,

2020.  (*Herman Decl.*, Ex. Q.)

On January 31, 2020 the Debtor advised Beekman by letter that the closing had

been scheduled for February 10, 2020 at 10:00 a.m. ("Adjourned Final Date") and

warned Beekman:

> **As Seller continues to incur substantial carrying costs with
> respect to the Property, Seller hereby advises that TIME IS OF
> THE ESSENCE with respect to the Closing now scheduled at
> Purchaser's request for February 10, 2020. The Closing shall**

**take place at the offices of Blank Rome LLP, 1271 Sixth Avenue,
New York, New York, 16th Floor at 10 a.m.**

(Time of Essence Letter (boldface in original).)  On the Adjourned Final Date, Beekman advised the Debtor that it was exercising its right pursuant to Paragraph 52(d) of the Purchase Agreement to extend the closing again, this time to March 10, 2020.  (*See Herman Decl.*, Ex. U.)  The proposed new Adjourned Final Date was more than thirty days after the Sale Order.  In fact, it was fifty-four days after the Sale Order.  On February 18, 2020, the Debtor notified Beekman it was terminating the Purchase Agreement based on Beekman's failure to close by the Adjourned Final Date and intended to retain the Downpayment as liquidated damages.  (*Serbagi Decl.*, Ex. 1.)

Under New York law, each party to a real estate contract must tender performance when time is of the essence with respect to the closing date.  *Donerail Corp. N.V. v. 405 Park LLC*, 952 N.Y.S.2d 137, 142 (N.Y. App. Div. 2012) ("[W]hen a party to a real estate contract declares time to be of the essence in setting a closing date, each party must tender performance on that date, and a failure to perform constitutes a default.").  "Where time is not of the essence, 'the law permits the respective parties a reasonable time in which to tender performance, regardless of whether the contract specifies a particular date on which such performance is to be tendered.'"  *In re 1111 Myrtle Ave. Grp. LLC*, 575 B.R. 567, 579 (Bankr. S.D.N.Y. 2017) (quoting *Mader v. Mader*, 476 N.Y.S.2d 195, 197 (N.Y. App. Div. 1984)).  Time is not considered of the essence unless the real estate contract contains a clear provision stating such or it is understood from the nature and circumstances of the contract.  *See Myrtle Ave. Grp. LLC*, 575 B.R. at 578.  However, even if a contract does not contain a time of the essence provision, a party "may, unilaterally, give subsequent notice to that effect and avail

22

himself of forfeiture on default, provided such notice is clear, distinct and unequivocal, fixes a reasonable time within which to perform, and informs the other party that a failure to perform by that date will be considered a default." *Liba Estates, Inc. v. Edryn Corp.*, 577 N.Y.S.2d 19, 20 (N.Y. App. Div. 1991); *accord Suslensky Report* ¶ 10.

The Purchase Agreement did not include a "time of the essence" clause but the Debtor gave notice to Beekman that time was of the essence with respect to the Adjourned Final Date in its Time of Essence Letter. The latter conspicuously and unequivocally stated that time was of the essence because of the substantial carrying costs the Debtor was incurring, informed Beekman of the time and place of the Closing and stated that the Debtor was ready, willing and able to deliver free and clear title to the Townhouse at that time.

It also gave Beekman a reasonable time to close. Beekman had selected the Adjourned Final Date of February 10, 2020. Moreover, the January 15 Letter indicated that Beekman was prepared to close on January 31, 2020 if a final confirmation order was in place ("[T]he buyer will elect to terminate the contract of sale if a bankruptcy plan is not final and non-appealable in time for a closing to occur by the current deadline, January 31, 2020."). Thus, it had the cash by then and has not stated that it needed time beyond February 10 to raise the cash.

Finally, the Time of Essence Letter informed Beekman that it would forfeit its Downpayment if it did not close by then ("Be rest assured that calling a time of the essence closing at this juncture, thereby requiring-Purchaser to close on the Final

Adjourned Date or forfeit its deposit, is unequivocally supported by the circumstances in this matter and firmly grounded under New York law.")

Beekman argues that because the Purchase Agreement provided it until forty-five days after the Sale Order to close, or by March 1, 2020, (*Beekman Motion* at 2), any time of the essence notice sent before that date was invalid. The argument suffers from two obvious flaws. First, the Purchase Agreement did not give it forty-five days after the Sale Order to close; it gave Beekman thirty days. Second, even if the Purchase Agreement gave Beekman forty-five days, Beekman sought to extend the Closing to March 10, fifty-four days after the entry of the Sale Order. This it had no right to do even under its own interpretation of the Purchase Agreement.

Furthermore, Beekman's principal contrary authority is distinguishable. In *North Triphammer Dev. Corp. v. Ithaca Associates,* 704 F. Supp. 422 (S.D.N.Y. 1989), the defendant agreed to sell real property to the plaintiff's predecessor. The sale agreement provided that the closing would occur within 120 days but did not say that time was of the essence. The 120th day was September 3, 1987. On August 6, one month *before* the contractual deadline, the defendant wrote to the plaintiff's predecessor, "[b]y way of postscript, I merely want to note that time is of the essence for a closing and your cooperation would be greatly appreciated." *Id.* at 424. The parties did not close by September 3, and on April 7, 1988, the plaintiff's predecessor wrote to the defendant declaring that it was ready to close on or about May 25, 1988, but no closing date was set, and the lawsuit followed. *Id.* at 425.

One of the issues in the case was whether the plaintiff had committed a material breach by failing to close by September 3, 1987.  The Court concluded that time was not of the essence despite the defendant's pre-deadline declaration that it was.  After setting out the general rules relating to making time of the essence (which I have already discussed), *see id.* at 429, the District Court first concluded that the words used in the defendant's August 6 letter, "by way of postscript"—and "your cooperation would be … appreciated"— were too ambiguous and vague.  *Id.* at 430.  In addition, "[n]o case has been cited, and none has been found, where time was unilaterally made of the essence of a contract before the date set forth in the contract has passed."  *Id.*  In contrast, the Debtor's Time of Essence Letter was clear and unequivocal for the reasons stated and was sent after Beekman selected a new closing date that fell beyond the January 31, 2020 contractual deadline.

Accordingly, Beekman committed a material breach by failing to close by February 10, 2020, and its attempt to further extend the Closing for a date later than the outside deadline set forth in the Purchase Agreement was ineffective.  This conclusion, however, is subject to the proviso that its obligation to close was not excused by the failure of the condition discussed immediately below.

### D.    **Ready, Willing and Able**

In order to recover damages, the Debtor must prove that it was ready, willing and able to perform on February 10.  *Pastor v. DeGaetano*, 8 N.Y.S.3d 79, 83 (N.Y. App. Div. 2015) ("[I]n order to obtain summary judgment permitting it to retain the deposit, the Estate 'must establish that it was ready, willing, and able to perform on the time-of-the-essence closing date, and that the purchaser failed to demonstrate a lawful excuse for its

25

failure to close.") (quoting *Donerail Corp.*, 952 N.Y.S.2d at 142).  It is undisputed that

the Debtor was ready, willing and able to transfer title to Beekman on the Adjourned

Closing Date.  Beekman asserts, however, that it was excused from non-performance on

the Adjourned Final Date because the Debtor failed to satisfy a condition precedent to

Closing and was thus not ready, willing and able to close.  *See Serdarevic v. Centex*

*Homes, LLC*, No. 08 CV 5563 VB, 2012 WL 5992744, at *2 (S.D.N.Y. Nov. 7, 2012)

("Defendant's performance, however, is nonetheless excused because the town's zoning

law caused a failure of a condition precedent to closure.").  Specifically, the Debtor

represented in the Purchase Agreement that "a sale under this Contract would be

sufficient to satisfy all claims against Seller and, as reasonably projected, Seller's

contemplated estate in bankruptcy. . . .," (Purchase Agreement ¶ 51(b), and under ¶

8(b), "Seller covenants and warrants that all of the representations and warranties set

forth in this contract shall be true and c0rrect at Closing."

    As a rule, a vendor that cannot satisfy a condition to closing is not ready, willing

and able.  *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 460 N.E.2d

1077, 1081-82 (N.Y. 1984); *Jobin Org., Inc. v. Bemar Realty, LLC*, 86 N.Y.S.3d 166, 169

(N.Y. App. Div. 2018); Restatement (Second) of Contracts § 225(1) & (2) (1981).

Although a party's obligation to perform is excused only where the other party has

committed a "breach of the contract . . . so substantial that it defeats the object of the

parties in making the contract," *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d

284, 289 (2d Cir. 1997), the materiality of a failure of a condition is generally irrelevant

unless circumstances render the condition impossible to perform.  *See Edelman Arts,*

*Inc. v. Art Intern. (UK) Ltd.*, 841 F.Supp.2d 810, 828 (S.D.N.Y. 2012).  "Nonetheless,

the nonoccurrence of the condition may yet be excused by waiver, breach or forfeiture. The Restatement posits that '[t]o the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.'" *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.,* 660 N.E.2d 415, 418 (N.Y. 1995) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 229).  "In determining whether the forfeiture is 'disproportionate,' a court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the non-occurrence of the condition is excused to the extent required to prevent forfeiture."  RESTATEMENT (SECOND) OF CONTRACTS § 229 cmt. b.

Whether the Debtor was ready, willing and able to meet the condition raises several factual questions.  First, could the Debtor pay all creditor claims "as reasonably projected," as of February 10, 2020.  The phrase is inherently ambiguous particularly since the proceeds would never be enough to satisfy all claims, including Golsorkhi's subordinated unsecured claim, yet Beekman was willing to close under the Plan.  And that the asserted claims exceeded the projected proceeds does not answer the question. For example, the Pelmadulla Claim, asserted in excess of $3 million, has since been settled for $250,000.  What then, was a reasonable projection of the allowed amount of that claim as of February 10?  Furthermore, the claim of Azari, the largest aside from the mortgagee and Golsorkhi, is the subject of litigation and the same question arises as to the reasonable projection of the allowed amount of that claim.  In essence, it appears

that the Court might have to estimate these claims to determine their reasonably projected allowed amount.

Second, if the Debtor could not satisfy the condition, would the enforcement of the condition cause a disproportionate forfeiture to the Debtor. If the condition is not excused, the Debtor (and the Debtor's creditors, which includes Golsorkhi) will forfeit the Downpayment. However, the Debtor retained title to the Townhouse following Beekman's breach and eventually sold the Townhouse for $11,500.000. Thus, the extent of the forfeiture raises a factual question.

Third, the "importance to [Beekman] of the risk from which [it] sought to be protected and the degree to which that protection will be lost if the non-occurrence of the condition is excused," also raises factual issues. According to Akabas, the risk was one of delay. Beekman preferred a sale under a plan and the sufficiency of the proceeds might affect whether the Debtor could quickly confirm a plan that paid all creditors in full and did not require any voting. On the other hand, Beekman had also agreed under certain conditions to buy the Townhouse pursuant to § 363 or even if no bankruptcy was pending and pay the Mansion Tax. In either case, the sufficiency of the sale proceeds and the confirmation of a plan would be irrelevant, and the sale could proceed without delay as it did.

Accordingly, whether the Debtor was ready, willing and able to comply with its representation regarding the sufficiency of the proceeds, and if not, whether it would cause a disproportionate forfeiture, requires a trial.

28

## E.    Rescission

Finally, Beekman's cross-motion includes a brief discussion of rescission based on fraudulent inducement arising from the failure to disclose the Pelmadulla Claim. (*Beekman Motion* at 31-33.)  Beekman's amended complaint in the adversary proceeding it had commenced did not assert a claim for rescission, its submissions on these motions do not include any other reference to rescission and it has not pointed to any act on its part promptly exercising its right to rescind.  *Allen v. WestPoint–Pepperell,* 945 F.2d 40, 47 (2d Cir.1991) ("An action for rescission must be initiated without unreasonable delay."); *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 850 F. Supp. 1199, 1211 (S.D.N.Y. 1994) ("Promptness is an element of a *prima facie* rescission action and the burden of proof is on plaintiff"), *aff'd*, 57 F.3d 146 (2d Cir. 1995); *Schenck v. State Line Telephone Co.,* 144 N.E. 592, 594 (N.Y 1924) (Cardozo, J.) ("[W]e do not deny that rescission to be effective must be announced without unreasonable delay." (citation omitted)).

In addition, although Beekman alluded to an objection at the January 14 hearing that it would waive under the parties' tentative settlement, the settlement had fallen through by January 15 and on January 16, Beekman never raised an objection the Sale Motion.  By then, it was armed with all of the facts that it now contends support rescission.  The Pelmadulla Claim was the subject of the January 14 hearing and the January 15 Letter referred to newly-asserted claims.  The January 15 Letter speculated that the Debtor might not have known about the Pelmadulla Claim, but according to Beekman, even an innocent misrepresentation will support a rescission claim.  (*See Beekman Motion* at 33.)  Thus, Beekman could have opposed the Sale Motion by

arguing that the Purchase Agreement had been induced by fraud and should be rescinded.  It did not, and the Sale Order, at ¶ C, included an express finding that "[t[he sale of the Property pursuant to the Purchase Agreement and this Order was negotiated by the Debtor and the Purchaser at arm's-length, without collusion or fraud, and in good faith within the meaning section 363(m) of the Bankruptcy Code."  Beekman's claim of rescission, to the extent it is making such a claim, constitutes a collateral attack on the Sale Order which, as noted, is final and non-appealable.

## CONCLUSION

Accordingly, the *Debtor's Motion* and the *Beekman Motion* are denied.  The Court has considered the parties' remaining arguments and concludes that they are without merit.

So ordered.

Dated:  New York, New York
        October 5, 2020

                                        /s/ *Stuart M. Bernstein*
                                        _STUART M. BERNSTEIN
                                        _ United States Bankruptcy Judge